HARRY B. HELMSLEY, *ET ALS.*, PLAINTIFFS-APPELLANTS, v. BOROUGH OF FORT LEE, *ET ALS.*, DEFENDANTS-RE-SPONDENTS.

AMERICANA ASSOCIATES, *ET ALS.*, PLAINTIFFS-APPEL-LANTS AND CROSS-RESPONDENTS, v. BOROUGH OF FORT LEE, *ET ALS.*, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.

NEW JERSEY REALTY COMPANY, *ET ALS.*, PLAINTIFFS-APPELLANTS AND CROSS-RESPONDENTS, v. BOROUGH OF FORT LEE, *ET ALS.*, DEFENDANTS-RESPONDENTS AND CROSS-APPELLANTS.

Argued May 22, 1978—Decided October 17, 1978.

201

On certification to Superior Court, Law Division, Bergen County (A–164/165 *Americana Associates v. Borough of Fort Lee* and A–166/167 *New Jersey. Realty Co. v. Borough of Fort Lee*).

*Mr. Richard F. Aronsohn, Mr. Martin Kesselhaut* and *Mr. David N. Ravin* argued the cause for appellants (*Messrs. Aronsohn, Kahn and Springstead* and *Messrs. Ravin and Kesselhaut,* attorneys; *Mr. Aronsohn, Ms. Lauren B. Cohen, Mr. Kesselhaut* and *Mr. Bernard Schenkler,* on the briefs).

*Mr. William T. Reilly,* argued the cause for respondents (*Messrs. McCarter and English,* attorneys; *Mr. Richard C. Cooper,* of counsel).

*Mr. Kenneth Meiser* argued the cause for defendant-intervenor, New Jersey Department of the Public Advocate (*Mr. Stanley C. Van Ness,* Public Advocate of New Jersey, attorney).

*Mr. John Atlas, Ms. Joan Pransky* and *Mr. Ronald Atlas* submitted a brief on behalf of *amici curiae* The New Jersey Tenants Organization, The Essex County Housing Coalition, and The East Orange Tenants Organization.

The opinion of the Court was delivered by

MOUNTAIN, J. Rent control ordinances have proliferated in the five years following this Court's decision in *Inganamort v. Borough of Fort Lee*, 62 *N. J.* 521 (1973), which upheld a municipality's power to enact such an ordinance. The principles governing attacks on the facial validity of rent control ordinances were discussed at length in *Hutton Park Gardens v. West Orange Town Council*, 68 *N. J.* 543 (1975); *Brunetti v. Borough of New Milford,* 68 *N. J.* 576 (1975), and *Troy Hills Village v. Parsippany-Troy Hills Tp. Council*, 68 *N. J.* 604 (1975) (hereinafter sometimes called the "Trilogy"). In those cases, we held that a rent control ordinance must permit an efficient landlord to realize a "just and reasonable" return. *Hutton Park Gardens, supra,* 68 *N. J.* at 568; *Brunetti, supra,* 68 *N. J.* at 592; *Troy Hills Village, supra,* 68 *N. J.* at 620. On the present appeal, we are required to determine whether the application of the rent control ordinances of Fort Lee has or has not denied landlords this minimum constitutional return.

I

Fort Lee enacted its first rent control ordinance in 1972. Under Ord. No. 72–1, landlords could increase rents by the percentage rise in the Consumer Price Index (hereinafter "CPI"). After the municipality's power to regulate rents was confirmed in *Inganamort v. Borough of Fort Lee, supra,* the ordinance was superseded by Ord. No. 74–32, effective November 6, 1974. Section 2 of the new ordinance still purported to limit rent increases to the percentage increase in the CPI. A crucial proviso, however, overrode the CPI limitation:

Notwithstanding any of the foregoing provisions of this section to the contrary, no landlord may request or receive a percentage increase in rent with respect to any housing space which is greater than two and one-half (2½%) per cent of the last prior rent during any calendar year.

In light of recent economic trends, the practical effect of Ord. No. 74–32 was to impose a 2.5% ceiling on rent increases.[1] In addition, Section 6 permitted landlords to pass through to tenants increases in property taxes. Landlords could seek hardship relief to supplement the automatic increases. Guidelines governing the granting of such relief were embodied in Ord. No. 75–45.

The validity of Ord. No. 74–32, or the "2.5% ordinance," was immediately challenged in A–163, *Helmsley v. Fort Lee,* an action in lieu of prerogative writ. The twelve plaintiffs, owners of multiple-family dwellings in the borough, contended that Ord. No. 74–32 was not justified by any housing emergency, and further that it deprived them of a fair and reasonable return on their investment.[2] On November 20, 1974 the trial court entered a temporary restraining order against enforcement of the 2.5% limitation on automatic rent increases.

On July 31, 1975 the trial court held the 2.5% limitation to be facially constitutional, but continued its order re-

---

[1]The Law Division has held recently that the 2.5% limitation also applied to charges for parking or garage space. *Central Towers Co. v. Borough of Fort Lee,* 160 *N. J. Super.* 546 (Law Div. 1978).

[2]We have confined our discussion to issues which are still present in this appeal. Thus, we will not address ourselves to Section 4 of Ord. No. 74–32, which tied rent increases to building and health code enforcement. The trial court held this section to be invalid, and Fort Lee has abandoned its cross-appeal. Similarly, defects which the trial court found in the tax surcharge provision were promptly corrected by amendments. Finally, we will not consider issues arising from Ord. No. 75–6, since they have been mooted by our decision in *Inganamort v. Borough of Fort Lee,* 72 *N. J.* 412 (1977), or the provisions of Ord. No. 76–8 dealing with landlords' security deposits for repairs, which are not implicated in the present appeal.

straining enforcement. By order, the court permitted the landlords to raise rents up to the percentage increase in CPI, but increases greater than 2.5% were to be placed in escrow. The restraining order and escrow arrangement have been continued during the appellate process. On March 31, 1977 the Appellate Division affirmed the trial court judgment.

Meanwhile, Fort Lee had enacted a major revision of its rent control system on June 30, 1976. Ordinance No. 76-8 limited automatic rent increases to a "maximum annual percentage," or "MAP," which was derived from increases in real estate taxes and specified components of the CPI. Thus, rent increases were to be related to operating cost increases. The details of the MAP plan will be discussed in Section V, *infra*. The MAP formula was not to become effective, however, until thirty days after the "final and complete disposition" of the appeal in *Helmsley v. Fort Lee*. Ordinance No. 76-8 also repealed, effective immediately, the sections of Ord. No. 74-32 which permitted landlords to pass through to tenants real estate tax increases. The impact of the tax passthrough repealer was substantial; the 1976 tax rate had been recently announced, and it represented a 30% increase over the 1975 rate.

Ordinance No. 76-8 was immediately challenged in two actions in lieu of prerogative writs, A-164, *New Jersey Realty Co. v. Fort Lee* and A-166, *Americana Associates v. Fort Lee,* which were consolidated for trial. The Fort Lee Tenants Association, and later the Department of the Public Advocate, were permitted to intervene as defendants. On March 11, 1977 the trial court held the tax passthrough repealer valid, effective June 30, 1976, but invalidated all other sections of Ord. No. 76-8 because of the contingent effective date.

On July 21, 1977 we granted certification in *Helmsley v. Fort Lee* and in the appeals and cross-appeals in *New Jersey Realty Co. v. Fort Lee* and *Americana Assoc. v. Fort Lee* then pending unheard in the Appellate Division. 75 *N. J.*

31, 32 (1977). We vacated the Appellate Division judgment in *Helmsley,* consolidated and remanded all three cases for a plenary hearing on the issue of just and reasonable return, at the same time retaining jurisdiction.

The 17-day hearing on remand concluded on December 14, 1977. It would serve no useful purpose to attempt to summarize, however briefly, all of the evidence adduced at this hearing. Instead, we will here merely outline the nature of the proofs, referring to specific factual showings, where appropriate, in later sections of this opinion.

The keystone of plaintiffs' case was a survey of the operating histories of 35 multiple-family buildings in Fort Lee, prepared by a certified public accountant whose clients include the operators of several Fort Lee apartment buildings. The 35 buildings in the survey contain 7542 apartments, or units; they comprise approximately 85% of all rental units in the borough. Fifteen buildings with 4958 units were classified as highrises, 11 buildings with 2053 units as lowrises, and 9 buildings with 531 units as garden apartments.[3] The survey included buildings whose landlords were not plaintiffs in this litigation. For each building, the landlord supplied detailed financial data for the years 1970 through 1976, including financial statements, utility and fuel bills, real estate tax bills, payroll and income tax returns, insurance and mortgage information, monthly rent rolls, and any applications for hardship relief. From these data several tables were prepared for each building showing actual profit and loss and projecting future trends under the 2.5% limitation. The plaintiffs' survey was interpreted by several expert real estate consultants. Other experts and several landlords discussed the theoretical and practical effects of rent control in Fort Lee. Several witnesses addressed the question of determining a just and reasonable return. Fort Lee pre-

---

[3]Highrises were defined as fireproof buildings with seven or more stories, lowrises as semi-fireproof buildings with fewer than seven stories, and garden apartments included all other buildings.

sented only one witness, a real estate consultant. He testified in general terms about relevant factors in fixing a just and reasonable return. Finally, the chairman of the Fort Lee Rent Leveling Board testified as the court's witness. He described the Rent Leveling Board's procedures.

On March 1, 1978 the findings and determinations on remand were filed. The court determined that "the entire Fort Lee rent control mechanism" was confiscatory and hence invalid.

As the abbreviated procedural history above suggests, this appeal is the culmination of long and complicated litigation. The complaint in *Helmsley v. Fort Lee* was filed almost four years ago, in November 1974. The length of the litigation has produced an unusual procedural situation. The focus of the *Helmsley* case has shifted over time. What started as an attack on the facial constitutionality of Ord. No. 74-32 has become a challenge to the ordinance's validity as applied. This is, moreover, an unusual test of an ordinance "as applied," for we are asked to rule on the ordinance's application to the entire borough of Fort Lee, rather than to an isolated building. Plaintiffs have made no attempt to single out their properties; their proofs have been addressed to the boroughwide impact of the ordinance. In the case of an individual building, the landlord would be required to exhaust his administrative remedies by seeking hardship relief. *Brunetti v. Borough of New Milford, supra,* 68 *N. J.* at 588. In Fort Lee, however, no administrative body is empowered to review the general effect of the rent control ordinance, at issue in the present case.

One troublesome consequence of the procedural posture described above is that we must reach general conclusions about all apartments in Fort Lee. Plaintiffs' data illustrate vividly the diversity among the 35 buildings in their survey, ranging from a 1260-unit highrise to an 11-unit garden apartment building. Further, even the financial histories of buildings with similar physical characteristics differ widely. Yet, to succeed, plaintiffs must demonstrate that the rent

control ordinance has a widespread confiscatory impact upon the disparate buildings in Fort Lee.

## II

Plaintiffs assert at the outset that there is no rational basis for enacting any rent control measure in Fort Lee. The preamble to Ord. No. 74–32 pointed to unwarranted, exorbitant rent increases to justify imposition of the 2.5% limitation. Plaintiffs claim that they have shown that rents in 1974 were at reasonable levels, and that no other factual basis for the ordinance existed.

Municipal authority to enact rent control ordinances under the police power delegated by *N. J. S. A.* 40:48–2 was recognized in *Inganamort v. Borough of Fort Lee, supra,* 62 *N. J.* 521 (1973). A rent control ordinance is a valid exercise of municipal power if there is any rational basis for the enactment. *Brunetti v. Borough of New Milford, supra,* 68 *N. J.* at 594; *Troy Hills Village, supra,* 68 *N. J.* at 616; *Hutton Park Gardens, supra,* 68 *N. J.* at 564–65.

Contrary to plaintiffs' contentions, their own proofs demonstrate an adequate factual basis for adoption of rent control in Fort Lee. In *Troy Hills Village, supra,* the municipality's expert testified that a vacancy rate of less than 3% indicated a serious housing shortage. Other testimony then showed that the local vacancy rate was less than 2%. We found that, on this basis, the governing body could rationally conclude that rent control was necessary. Similarly, in the present case, several of plaintiffs' experts stated that a 5% vacancy rate was typical of a housing market in equilibrium; one fixed a 3% vacancy rate as indicative of a housing shortage. Plaintiffs' financial data indicate a 1973 vacancy rate of less than 1.5% in 28 buildings with 4648 units. One 1260-unit complex, Horizon House, had a 7% vacancy rate which appears to be aberrational. Even including Horizon House, the borough-wide vacancy rate was 2.6%. As in

*Troy Hills Village, supra,* these data constitute a rational basis for adoption of rent control. We note parenthetically that vacancy rates dropped under Ord. No. 74–32. The 1976 vacancy rate in 35 buildings with 7542 units was 1.9%. Thus it is apparent that there continues to be a rational basis for rent control in Fort Lee.

█ The vacancy rate data render irrelevant plaintiffs' contention that no exorbitant rent increases preceded enactment of the 2.5% ordinance. We note in passing, however, that the testimony plaintiffs cite on reasonableness of rents was almost wholly conclusory, without adequate foundation. Further, plaintiffs' financial data are equivocal at best. Between 1970 and 1973, plaintiffs' data reveal percentage increases in net operating income, see Note 5 *post,* greater than the increase in the CPI in one highrise, 6 of 7 lowrise buildings, and 4 of 7 garden complexes. That is, for these buildings, landlords' profits were keeping ahead of inflation. While these data do not necessarily establish a pattern of rent gouging, neither do they refute the assertion in the preamble to Ord. No. 74–32 that speculative and unwarranted rent increases were being demanded.

## III

█ We turn now to the constitutionality of Ord. No. 74–32, which limited annual rent increases to 2.5% and permitted landlords to pass through to tenants increases in real estate taxes. It is axiomatic that a rent control ordinance must permit an efficient landlord to realize a "just and reasonable return" on his property. *Hutton Park Gardens, supra,* 68 *N. J.* at 568. Satisfactory formulations of just and reasonable return, however, have proven to be elusive. Before reaching the question as to what level of return is confiscatory, consideration must first be given to what constitutes the proper formula for computing a landlord's return.

There are at least three basic approaches to defining fair return. In an early regulatory case, the United States Supreme

Court decreed that return on fair value must be the criterion for confiscation.[4] *Smyth v. Ames,* 169 *U. S.* 466, 545, 18 *S. Ct.* 418, 433, 42 *L. Ed.* 819, 849 (1898), decree modified, 171 *U. S.* 361, 18 *S. Ct.* 888, 43 *L. Ed.* 197 (1898). The Court later modified this position, approving (but not mandating) the use of return on investment. *Federal Power Comm'n v. Hope Natural Gas Co.,* 320 *U. S.* 591, 64 *S. Ct.* 281, 88 *L. Ed.* 333 (1944). A third standard, the fraction of gross income comprised by operating profits, was employed in the now-expired New Jersey Rent Control Law, L. 1953 c. 216. We upheld its constitutionality in *Jamouneau v. Harner,* 16 *N. J.* 500, 526–28 (1954), *cert.* denied, 349 *U. S.* 904, 75 *S. Ct.* 580, 99 *L. Ed.* 1241 (1955).

Plaintiffs attempted to show that the operation of the 2.5% ordinance had denied them a just and reasonable return on the value of their buildings. They presented several expert witnesses who attempted to calculate the rate of return upon the value of the property in "a hypothetical market in which the supply of available rental housing is just adequate to meet the needs of the various categories of persons actively desiring to rent apartments in the municipality." *Troy Hills Village, supra,* 68 *N. J.* at 624. Plaintiffs' proofs were insufficient to show confiscation on this theory.

First, plaintiffs failed to meet the standards articulated by their own witnesses. Stephen Lewinstein, John Bailey and R. A. Stuart Miller testified as experts in evaluating real estate investment opportunities. They stated that investors desired a rate of return on value, defined as the ratio

---

[4]Determination of fair value is a complex problem. Factors which may enter into a value determination include depreciated original cost, depreciated prudent investment, reproduction cost less depreciation, market value, and earning capacity. See, *e. g., Troy Hills Village, supra,* 68 *N. J.* at 624–25; *Public Service Co-ordinated Transport v. State,* 5 *N. J.* 196, 217 (1950). The problem of valuation will be discussed below in light of the record in the present case.

between net operating income ("NOI") and value,[5] of 10.5% to 12%. In addition, Bailey presented data showing apartment building sales in which the expected net operating income ranged from 8% to 12% of the sales price. Plaintiffs contended in their brief that the expert testimony established that investors desired a rate of return "in the range of 10%." Assuming *arguendo* that this is the mini-

---

[5]As defined by all witnesses, the net operating income is total income less *operating* expenses (*e. g.*, maintenance costs, administrative expenses, fuel, real estate taxes). Depreciation, a noncash item, is not considered an operating expense. Debt service is not classified as an operating expense, and will be paid out of net operating income. NOI less debt service is the landlord's cash flow before income taxes.

One witness, a certified public accountant, defined rate of return on value as the ratio between "net profit before debt service" (net operating income less depreciation) and equalized assessed valuation. This definition conflicted with that used by every other witness; further, this witness's definitions of profit and value are both highly artificial. He employed an arbitrary depreciation allowance (2.5% of assessed valuation in 1970) which bore no relationship to the actual depreciation claimed by individual landlords. Nor did he explain his decision to include a noncash "expense" (depreciation) while excluding debt service, an even larger cash item. Finally, deducting depreciation without recognizing its utility as a tax shelter may be misleading.

His definition of value is also open to question. He employed equalized assessed valuation, which is the assessed valuation multiplied by an equalization factor which reflects the relationship between assessed valuation and sales price for recent arms'-length transactions in the borough. There was no general reassessment in Fort Lee between 1970 and 1976; therefore, the substantial increase in equalized assessed valuation for individual buildings in that period is based solely on changes in the equalization ratio. According to the record, however, there were no arms'-length sales of apartment buildings in the borough during the same time. Thus, the inflated equalized assessed valuations for apartment houses would appear to have been based on the increased value of non-apartment properties. In light of plaintiffs' assertions that their buildings have decreased in value under rent control, and the successful outcome of several recent tax appeals by landlords, we are forced to conclude that the equalized assessed valuations did not approximate the buildings' market value.

mum constitutional "just and reasonable" return, see *Hutton Park Gardens, supra,* 68 *N. J.* at 568, we consider plaintiffs' value data.

As we will discuss below, estimation of value presents difficult problems of proof. For the moment, we will accept plaintiffs' proffered expert opinions on value. R. A. Stuart Miller estimated the value of 22 buildings in 1976 in a hypothetical equilibrium market. (Bailey presented similar estimates for three buildings, but no conclusions as to the general impact of a rent control ordinance can be drawn from a sample so small.) Using Miller's valuation material and the 1976 net operating income derived from plaintiffs' survey, we can calculate rates of return on value. These data reveal rates of return "in the range of 10%,"[6] plaintiffs' postulated desired return. Thus, by plaintiffs' own criteria they have failed to prove that return on value was confiscatory.

This case was the first serious attempt to prove a rent control ordinance confiscatory as applied under *Troy Hills Village, supra.* Consequently, we feel constrained to comment on some of the problems which were revealed by this litigation. As predicted in *Troy Hills Village, supra,* valuation presented "difficult problems of proof." 68 *N. J.* at 624. The preferred valuation method for apartment buildings is capitalization of income, since investors purchase apartment

---

[6]The table below summarizes the range of rates of return observed using 1976 net operating income and Miller's hypothetical equilibrium valuations.

| Type of Building | Range | Median |
|---|---|---|
| Highrise | 8.6–11.7% | 9.6% |
| Lowrise | 9.2–11.0% | 9.7% |
| Garden | 9.2–10.2% | 10.1% |

All "1976 net operating income" figures in this opinion have been adjusted, where possible, to include any uncollected fraction of the 1976 property tax passthrough. This adjustment is necessary in light of the economic significance of the tax passthrough as indicated in our discussion of the impact of its repeal. See section IV *post.*

buildings as income-producing properties. See North, "Appraisal of Apartment Buildings," in *Encyclopedia of Real Estate Appraising* 196 (Friedman ed. 1968). Not surprisingly, all the valuation data at the remand hearing were based on capitalization of income. Once income is controlled, however, using capitalization of income to determine value to regulate future income is a circular process.[7] In theory, one could rely upon comparable sales data to avoid the circuity problem. In practice, unfortunately, arms'-length sales of rent controlled apartment buildings are rare. None has been reported in Fort Lee since rent control was imposed in 1972. Sales prices of "comparable" buildings not subject to rent control offer little guidance. The source of an apartment building's value is its income stream; therefore, income will be a crucial factor in determining comparability. Rent control, however, limits the potential growth of that income stream (and also therefore the potential capital appreciation on resale). Thus, the expected future income of a building subject to rent control will be less than that of a "comparable" uncontrolled building. The difference in future income will, of course, be reflected in present value. Construction or replacement cost, a third valuation method, is used pri-

----

[7]For example, assume that a rent leveling board determines that the proper capitalization rate is 10%. The value of a building with net operating income of $100,000 is therefore $1,000,000. If net operating income drops to $90,000, "value" falls to $900,000, and the owner is still technically receiving a 10% return on value.

If a rent leveling board sets a rate of return that is not the same as the capitalization rate, the result is an income-value spiral. Assume, as before, a 10% capitalization rate to determine value. Also assume that a rent leveling board decides to permit an 11% return on value to encourage maintenance. The building with net operating income of $100,000 is still valued at $1,000,000, but the landlord's permitted return is $110,000. The value of a building with net operating income of $110,000, however, is $1,100,000. Therefore, permitted return must increase to $121,000, leading to increased value, and so on. Conversely, permitting a rate of return less than the capitalization rate leads to a downward income-value spiral.

marily for insurance appraisals of apartment buildings. At best, it determines an upper limit on present market value. See *North, supra,* at 197; Wendt, *Real Estate Appraisal* 212 (1956). Finally, assessed valuation will be based on one or more of the above methods, and will therefore be vulnerable to corresponding criticism.

The theoretical problems of valuation were here compounded by the practical difficulties of estimating value in a hypothetical housing market where supply and demand are in equilibrium. None of the witnesses had performed such an analysis before; none knew of any recognized appraisal method for making hypothetical equilibrium valuations. Indeed, plaintiffs' expert testimony concerning the existence of equilibria in Fort Lee was contradictory. Further, no satisfactory foundation was laid for much of this testimony. Hypothetical equilibrium valuations in rent controlled markets must depend upon comparisons with other municipalities or other time periods, since rent control would not be necessary if the housing market were in equilibrium. In *Parkview Village Assoc. v. Borough of Collingswood,* 62 *N. J.* 21, 30–33 (1972), this Court discussed the use of "comparable" buildings in valuation. We stressed that comparisons with several buildings with similar physical characteristics from the same geographic area should be used. *Parkview Village Associates, supra,* dealt with tax assessments, where local comparisons are readily available. Under rent control, however, contemporaneous local comparisons are unavailable by hypothesis. Furthermore, the requisite foundation for comparability of geographically remote buildings is difficult and expensive to establish.

In *Troy Hills Village, supra,* we outlined tentative guidelines for determining whether a rent control ordinance was confiscatory. At the same time, we cautioned that further litigation would be needed to illuminate this complex subject. After considering the massive record compiled by plaintiffs, we are satisfied that a value-based criterion for confiscation under rent control is practically unworkable.

Plaintiffs did not restrict their arguments to return on value. Although they presented no data on the amount of their investment,[8] they did introduce detailed histories of operating expenses and income for 85% of all apartment units in Fort Lee. This information permits us to evaluate the borough-wide impact of the challenged ordinance upon landlords' net operating income.

Several income-based standards for confiscation under rent control have been employed in other legislation. One such approach places a ceiling upon the fraction of total income a landlord can be expected to spend for operating expenses. For example, the New Jersey Rent Control Law, L. 1953, c. 216 § 16(h), permitted landlords to seek a rent increase when operating expenses rose above 75% of total income. The rent control bill introduced last session in our Legislature contained a similar provision, but relaxed the confiscation threshold to 60% of total income. New Jersey Assembly Bill No. 504 (1978). New York City's maximum base rent ("MBR") formula allots 57.6% of total income to operating expenses for buildings under rent control.[9] Note, *The ABC's of MBR: How to Spell Trouble in Landlord/Tenant Rela-*

---

[8]In view of the lack of evidence concerning plaintiffs' investment, we offer no comments on investment-based criteria for determining confiscation. Our silence does not, however, denote disapproval. Other jurisdictions have employed such criteria. See, *e. g.*, *Marshal House, Inc. v. Rent Control Bd. of Brookline*, 358 *Mass.* 686, 266 *N. E.* 2d 876, 888 (1971). Although an investment-based standard may not be as easy to apply as some income-based criteria, there are no obvious theoretical obstacles to using an investment-based standard.

[9]There are two systems of rent regulation in New York City. Rent control, administered by a city agency, employs a formula to determine the maximum base rent for each unit. Rent stabilization is administered by a private real estate industry organization under the supervision of a city agency. Stabilized rents are permitted to rise by a percentage based on the Bureau of Labor Statistics Price Index of Operating Costs for Rent Stabilized Apartments in New York City. ("NYC Index").

*tions,* 10 *Colum. J. Law & Soc. Prob.* 113, 123 (1974). A second approach, used in Cambridge, Massachusetts, guarantees a landlord a "fair net operating income," based upon the actual NOI in a base year adjusted to compensate for inflation. In other words, the Cambridge plan assumes that a landlord's profits at a specified date in a free housing market were fair. The inflation adjustment thus attempts to keep the landlord in the same economic position under rent control.

Turning to Fort Lee, rent control has had a perceptible impact upon the magnitude of NOI and upon the fraction of gross income that NOI represents.[10] NOI in 1976 current dollars remained at or slightly below 1973 levels in most buildings. The highrises as a class fared distinctly worse than lowrise and garden complexes. The median change in highrise NOI was approximately a 5% decrease between 1973 and 1976; the median change for lowrise and garden complexes was less than 1%. While isolated buildings showed declines in NOI of up to 25%, no building experienced a substantial increase. Over the same time period, the Consumer Price Index increased aproximately 30%. Thus, in terms of purchasing power, all landlords' NOI decreased by roughly one-quarter.

The operating ratios show that landlords were spending approximately 10% more of their income for operating expenses in 1976 than in 1973. The median operating ratio for high-

---

[10]NOI in 1976 as a percentage of its level in 1973 is tabulated below for 22 buildings built before 1970:

| Class | Range | Median |
|---|---|---|
| Highrise | 76.6–103.9% | 94.5% |
| Lowrise | 93.2–104.3% | 99.1% |
| Garden | 77.6–102.2% | 99.6% |

The "operating ratio" (the ratio between operating expenses and total income) is tabulated below for the same buildings.

| Class | 1973 | | 1976 | |
|---|---|---|---|---|
| | range | median | range | median |
| Highrise | .425–.594 | .475 | .529–.661 | .566 |
| Lowrise | .397–.554 | .416 | .472–.585 | .521 |
| Garden | .353–.577 | .415 | .443–.678 | .505 |

rises, .566, was approaching the .600 level deemed confiscatory by Assembly Bill No. 504; four highrises with 1900 units had operating ratios greater than .600. "New" buildings (defined by plaintiffs as those fully rented after 1970) appeared to be in financial distress in 1976. In seven new buildings, with 1744 units, income was not adequate to cover operating expenses and debt service. Only five new buildings, with 439 units, had positive cash flows in 1976.

These data must be measured against plaintiffs' goal: to invalidate the 2.5% limitation as applied to all apartments in the borough, not simply to a single building. To succeed, plaintiffs must show by clear and convincing evidence that the ordinance had a wide-spread confiscatory impact upon efficient landlords. See *Hudson Circle Service, Inc. v. Kearny,* 70 *N. J.* 289, 298–99 (1976); *Hutton Park Gardens, supra,* 68 *N. J.* at 564–65; *Moyant v. Paramus,* 30 *N. J.* 528, 534–35 (1959). The 1976 data fail to meet this standard on several counts.

First, the 1976 data show NOI in most buildings, including highrises, to be within 5% of the 1973 level. The financial histories submitted by plaintiffs, however, contain sizable year-to-year discontinuities in operating costs for individual buildings. A simple comparison of figures for 1976 and 1973 is vulnerable to distortion caused by abnormalities in either the 1976 or 1973 data. Plaintiffs have not submitted any more sophisticated statistical analysis. Therefore, we are reluctant to attach great significance to relatively small changes in the median NOI level. We recognize that an unchanged NOI in current dollars represents a loss in purchasing power in an inflationary economy. In theory, long-term stagnation of profits might be proved to be confiscatory. On the present record, however, we cannot say that the 2.5% limitation was confiscatory because landlords' profits remained approximately constant between 1973 and 1976.[11]

---

[11] Further, the comparisons we have drawn are sensitive to the definition of pre-rent control profits. We have used 1973, the last

Second, the 1976 operating ratios are similarly incon-
clusive. Although they are rising, we cannot say on this
record that the general level is clearly confiscatory. Here
again, plaintiffs presented only sketchy and conclusory testi-
mony.

Third, low NOI and high operating ratios appear to be
concentrated among a small number of buildings, many of
which have unusual financing arrangements or operational
experience.[12] These buildings may well qualify for hard-

complete year before Ord. No. 74–32 was enacted. 1973, however,
was a better year for most Fort Lee landlords than either 1972 or
1974. Because the 2.5% limitation took effect only as leases ex-
pired in November and December, Ord. No. 74–32 had virtually no
impact in 1974. It would be unfair to the landlords, however, to
use 1974 as the standard for pre-control profits, since the Arab oil
embargo drastically reduced profits that year. On the other hand,
the pattern of rent increases in 1970–73, see section II *ante*, sug-
gests that using 1973 as the standard may be unduly generous to the
landlords. Under these circumstances, we do not find the 1976 profit
level to be confiscatory.

[12]For example, the largest complex with financial troubles is
Horizon House, a 1260-unit highrise. In 1975 its operating ratio
was 0.689; in 1976 after HUD preempted local rent control and
permitted a 6% rent increase, the operating ratio remained a high
0.667. The financial distress of Horizon House is not in doubt. Its
posture as a representative of efficient Fort Lee operators, however,
is questionable. In 1970–72, while most other landlords in Fort Lee
enjoyed rising profits, Horizon House's NOI plummeted 30%. In
1973, NOI recovered slightly, but the operating ratio (0.594) was
the highest in Fort Lee. In addition, the Horizon House vacancy
rate was the highest in the borough in 1973, more than double the
overall vacancy rate. Thus, it is clear that Horizon House's financial
woes predate the 2.5% ordinance. Its experience under the ordi-
nance cannot be considered typical of other buildings.

Four buildings had negative cash flows and operating ratios above
0.600 in 1976: Imperial House, a 55-unit highrise built in 1969;
Bridge Plaza Towers, a 114-unit highrise fully rented in 1974; Colony
Apartments, a 484-unit highrise fully rented in 1974; and The
Riviera, a 35-unit lowrise fully rented in 1974. The financial data
of the four buildings suggest that, like Horizon House, their 1976
experience is not typical of other Fort Lee buildings. Imperial
House's NOI fell by 25% in 1976, largely as a result of a 40% in-
crease in operating expenses (excluding real estate taxes). The

ship relief. A limited number of hardship cases alone, however, does not show widespread confiscation. In the *Trilogy, supra,* we anticipated the likelihood that isolated buildings might require hardship relief from the workings of reasonable rent control schemes. Plaintiffs have not shown that the hardship applications through 1976 were not isolated cases.

Although plaintiffs failed to prove that the 2.5% ordinance had a confiscatory effect before December 31, 1976, their proofs demonstrate that the foreseeable impact of the 2.5% limitation after 1976 will be widespread confiscation. Using the financial data plaintiffs submitted, we can construct a conservative picture of a representative, efficiently run Fort Lee building. In 1976, its operating ratio was 0.500, and its NOI was roughly equal to its NOI in 1973. Its debt service consumed approximately one-third of its 1976 income if it was a highrise (approximately one-quarter otherwise).

We now consider the future effect of limiting rent increases to 2.5%. Under the ordinance, real estate tax increases will be passed through to tenants. The automatic rent increase will cover a 5% increase in other operating expenses. If, however, other operating expenses increase faster than 5% annually, NOI will decline proportionately.[13] To determine

---

corresponding increase in expenses for other old highrises ranged from 2% to 17%. While Imperial House's expenses may have been reasonable for that building, its 1976 experience is clearly not representative of other Fort Lee highrises. Bridge Plaza Towers and The Riviera both appear to have unusually heavy debt service obligations (approximately 40% and 45% of total income in 1976, respectively) in comparison with other buildings. Debt service consumes about 33% of income for older highrises and 25% for older lowrises. Again, we question only the typicality, not the reasonableness, of these financing expenses. Finally, the Colony also has extremely high debt service (42% of 1976 income), due to recent high interest rates coupled with an unusually large dependence upon debt financing. In receivership, the Colony can hardly be termed a typical Fort Lee building.

[13]The table below shows the effect of a 2.5% automatic rent increase and a 5% increase in operating expenses each year.

the landlord's cash flow, we must deduct debt service from NOI. A representative highrise would pay roughly one-third of its 1976 income for debt service. For such a building, the example in note 13 *ante* shows that five years of 6% operating expense increases and 2.5% rent increases would produce a 5.4% decrease in NOI. After deducting debt service, however, the landlord's cash flow would decrease approximately 20%.

In fact, operating expenses cannot be expected to increase at a uniform rate. The NYC Index, see note 9 *ante,* and the CPI have risen erratically in the last decade, as the table below shows.

| Year | NYC Index* | % Increase | CPI* | % Increase |
|------|-----------|-----------|------|-----------|
| 1967 | 100.0 | | 99.3 | |
| 1968 | 103.5 | 3.5 | 102.9 | 3.6 |
| 1969 | 107.6 | 4.0 | 109.7 | 6.6 |
| 1970 | 116.6 | 8.4 | 117.7 | 7.3 |
| 1971 | 132.2 | 13.4 | 124.6 | 5.9 |
| 1972 | 139.7 | 5.7 | 130.4 | 4.7 |
| 1973 | 150.8 | 7.9 | 137.5 | 5.4 |
| 1974 | 179.7 | 19.2 | 150.9 | 9.7 |
| 1975 | 191.3 | 6.5 | 163.7 | 8.5 |
| 1976 | 203.5 | 6.4 | 174.3 | 6.5 |
| 1977 | 219.5 | 7.9 | 183.7 | 5.4 |

| Year | Income | Op. Exp. | NOI |
|------|--------|----------|-----|
| 1976 | $100,000 | $50,000 | $50,000 |
| 1977 | 102,500 | 52,500 | 50,000 |
| 1978 | 105,062 | 55,125 | 49,937 |
| 1979 | 107,689 | 57,881 | 49,808 |
| 1980 | 110,381 | 60,775 | 49,606 |

The table below shows the effect of a 2.5% automatic rent increase and a 6% increase in operating expenses each year.

| Year | Income | Op. Exp. | NOI |
|------|--------|----------|-----|
| 1976 | $100,000 | $50,000 | $50,000 |
| 1977 | 102,500 | 53,000 | 49,500 |
| 1978 | 105,062 | 56,180 | 48,882 |
| 1979 | 107,689 | 59,550 | 48,139 |
| 1980 | 110,381 | 63,124 | 47,257 |

In both cases, a highrise would require about $33,000 for debt service. Other types of buildings would require $25,000.

*The NYC Index is determined in April of each year. For comparability, the CPI in the table is the New York, N. Y.-Northeastern N. J. "All items" index for April of each year.

Neither the CPI nor the NYC Index is a perfect measure of landlords' expenses in Fort Lee. Both indicate, however, an annual rate of inflation substantially in excess of 5%. In fact, the rent guidelines based on the NYC Index permitted landlords to increase rents 6.5% on one-year leases through June, 1978. The rate was lowered to 3.5% effective July, 1978. In short, there is nothing in the record to suggest that the increase in operating expenses may be expected to be limited to no more than 5% annually. Consequently, the unrelieved operation of the 2.5% automatic increases can be expected to diminish NOI steadily for most, if not all, landlords in Fort Lee.[14]

The last statement distinguishes the effect of rent control in Fort Lee before and after 1976. As discussed above, the financial data through December 31, 1976 do not show a general confiscatory impact throughout the borough. Some buildings prospered while others suffered losses. The "average" building had profits in 1976 approximately equal to pre-control profits in 1973. Where financial difficulties were manifested, they were frequently traceable to pre-control sources not common to other buildings. After 1976, however, the picture changes. As a result of the disparity between

--------

[14]The main reason that NOI did not decrease sharply before 1976 appears to be that the full impact of the 2.5% limitation was delayed. The limitation only affected leases signed after November 6, 1974. During the next year, as leases expired, the limitation was phased in. Not until 1976 was a full year's income subject to the 2.5% limitation. Thus, 1976 income was 13% greater than 1973 income for 20 older buildings; had the limitation been fully effective in 1974 and 1975, the permissible increase would have been less than 8%. Further many landlords did not apply the 2.5% limitation to garage rents, and they attempted to compensate for the ceiling on apartment rents with substantial increases in garage charges. This strategy was recently invalidated by the Law Division. See note 1 *ante.*

increases in rents and in operating expenses, the "average" landlord can expect profits to fall for the indefinite future. At some point, steady erosion of NOI becomes confiscatory.[15] The exact date will differ for each building, but the result is foreseeable. We need not determine the exact threshold of confiscation. That, too, may differ for each building. The general effect of the ordinance, however, is clear.

The Constitution does not require a municipality to permit all cost increases to be passed through to tenants in rent-controlled units. *Troy Hills Village v. Tp. Council of Parsippany-Troy Hills, supra,* 68 *N. J.* at 632. A rent control scheme must, however, permit landlords to realize a just and reasonable return. *Id.* In *Brunetti v. Borough of New Milford, supra,* 68 *N. J.* at 590 n. 16, we stated:

Plaintiffs argue that this holding would permit a municipality to dispense with all automatic increases and require hearings prior to any rental increase. They are correct; so long as the procedure is not so arbitrary and unavailable as to preclude relief, there is no constitutional obstacle to this approach.

In a companion case we also observed that ordinances should include standards and criteria which would enable a landlord to determine whether it is entitled to hardship relief. *Troy Hills Village, supra,* 68 *N. J.* at 620–21.

The Supreme Court of California recently considered the constitutional sufficiency of administrative relief under a rent control ordinance in *Birkenfeld v. City of Berkeley,* 17 *Cal.* 3d 129, 130 *Cal. Rptr.* 465, 550 *P.* 2d 1001 (1976). There, rent control was adopted as an amendment to the city charter. Base rents were established by a rent rollback. Rent increases were permitted only by approval of a five-member rent control board after a hearing on a unit-by-unit basis. Petitions for rent increases in multiple units in one

---

[15] We do not hold that keeping NOI constant (in current dollars) indefinitely is not confiscatory. The effect of such long-term stagnation of profits is not before us.

building could be consolidated only with the written consent of a majority of the affected tenants. Each petition had to include a certificate of compliance with all building code provisions issued within the last six months. In reviewing the petitions, the board was directed to consider a list of factors similar to that in Fort Lee Ord. No. 75–45.

The California Supreme Court held unanimously that the charter amendment was facially unconstitutional because the procedure it prescribed for rent adjustments made inevitable unreasonable delays in raising confiscatory rent ceilings. 17 *Cal.* 3d at 169, 130 *Cal. Rptr.* at 493–94, 550 *P.* 2d at 1029–1030. The Court stated:

> It is clear that if the base rent for all controlled units were to remain as the maximum rent for an indefinite period many or most rent ceilings would be or become confiscatory. *For such rent ceilings of indefinite duration an adjustment mechanism is constitutionally necessary to provide for changes in circumstances and also provide for the previously mentioned situations in which the base rent cannot reasonably be deemed to reflect general market conditions. The mechanism is sufficient for the required purpose only if it is capable of providing adjustments in maximum rents without a substantially greater incidence and degree of delay than is practically necessary.* "Property may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them . . . ." (*Smith v. Illinois Bell Tel. Co.* (1926) 270 U. S. 587, 591, 46 S. Ct. 408, 410, 70 L. Ed. 747 (enjoining enforcement of telephone rates because of unreasonable delay in acting upon application for rate increase).) The charter amendment is constitutionally deficient in that it withholds powers by which the rent control board could adjust maximum rents without unreasonable delays and instead requires the Board to follow an adjustment procedure which would make such delays inevitable. [17 *Cal.* 3d at 169, 130 *Cal. Rptr.* at 494, 550 *P.* 2d at 1030; emphasis added]

The court specifically critized the board's inability to formulate and apply general rent adjustments or to delegate any of the required hearings.

In a similar decision, the District of Columbia Court of Appeals ordered implementation of prompt administrative relief before a rent control plan could take full effect. *Apartment & Office Building Assoc. v. Washington,* 343 *A.* 2d

323 (D. C. Ct. App. 1975). The District of Columbia Rent Control Act of 1973 authorized the District of Columbia City Council to adopt a rent control plan which permitted landlords to pass cost increases through to tenants. The council enacted a rent control regulation which set base rents through a rent rollback procedure and established a Housing Rent Commission, whose approval was a prerequisite to any rent increase. The court ruled that "a condition precedent to enforcement of rent control is a viable means whereby landlords may recoup the amount of increased costs to which they are entitled." 343 *A.* 2d at 326. Although the regulation required the Commission to act upon petitions for rent increases within 60 days, the Rent Commission had admitted that it could dispose of only a small fraction of petitions within that time. The court stated:

. . . the hardship adjustment procedure is inherently incapable of functioning as the required pass-through mechanism. *Despite the fact that a maximum 60-day limit for agency actions seems reasonable, appellants' statutory rights become totally illusory if the system charged with protecting them becomes so lethargic and cumbersome as to be inoperable.* Hence, Regulation No. 74–20 was promulgated without even a meaningful expectation of implementing the required pass-through right, despite the purported method of dealing with the matter. [343 *A.* 2d at 331; footnotes omitted; emphasis added]

The court affirmed the trial court's order staying the rent rollback and directed the city to implement within 90 days an effective cost pass-through mechanism. One judge would have held the regulation facially invalid because of its "cumbersome procedures." 343 *A.* 2d at 334. One judge criticized the latter position, arguing that "[b]ecause a statute or regulation is unworkable due to lack of personnel does not mean it is *facially* invalid." 343 *A.* 2d at 336 (emphasis added). He concurred, however, in staying the rent rollback because of the unavailability of hardship relief.

The Berkeley and Washington, D. C. rent control plans differ in many respects from that of Fort Lee. Berkeley's unit-by-unit adjustment, for example, has no Fort Lee parallel. Washington's cost pass-through requirement was statutory, not constitutional, in origin. These differences need not detain us. The principles expressed in the California and District of Columbia cases, *supra,* are not derived from the minutiae of individual rent control plans. Rather, these cases are based upon the commonplace notion that effective remedies are necessary to safeguard legal rights. Landlords in Berkeley, Washington, and Fort Lee all are entitled to some minimum income level. In Berkeley and Fort Lee, that level is the minimum necessary to yield a constitutional return; under the Washington statute that level may be higher than the constitutional minimum. In Berkeley and Washington the absence of any automatic rent increases virtually guaranteed that a landlord's income would fall below the minimum acceptable level pending administrative approvals of rent increments. The inadequate automatic rent increases in Fort Lee will foreseeably lead to similar confiscatory results.

We share the view of the California Supreme Court that where a rent control scheme will have a foreseeable, widespread confiscatory impact, it is constitutionally necessary to provide a mechanism "capable of providing adjustments in maximum rents without a substantially greater incidence and degree of delay than is practically necessary." *Birkenfeld, supra,* 17 *Cal.* 3d at 169, 130 *Cal. Rptr.* at 494. The landlord of a rent controlled building in Fort Lee must realize inadequate income before it can obtain relief. The confiscation precedes the redress in this case. Some short-term uncompensated confiscation may well be unavoidable under rent control, but it is essential that the severity and duration of such takings be minimized.

The foreseeable confiscatory effect of the 2.5% limitation requires us to examine the availability of administrative relief under the Fort Lee ordinances. Hardship applications

are decided by the Fort Lee Rent Leveling Board ("Board").
The Board must contain one representative of each of the
landlords, tenants, and homeowners; aside from this, there
are no special requirements for membership. The seven-
member Board serves without compensation. Although
Ordinance No. 74–32 provided for appeals to the borough
council, the council has not, in practice, reviewed Board
decisions.

Hardship relief, if granted, expires in one year unless it
is reconsidered and renewed by the Board. It is not an
adjustment to the base rent used to compute automatic
increases. There is no mechanism in the Fort Lee ordinances
for readjusting base rents, or for granting any general
increases in response to common, sudden cost increases such
as the 1974 jump in fuel prices. Consequently, a successful
hardship applicant must reapply every year. Under present
economic conditions, the combined effect of this hardship
relief structure and the 2.5% limitation must be to force a
greater and greater number of landlords to seek annual
hardship relief.

This is not mere conjecture. The Rent Leveling Board
received three hardship applications in 1975 and four in
1976. In 1977, the Board received 12 applications covering
more than 3173 units. It granted hardship relief to 8
buildings with more than 2328 units aggregating
$1,128,180.[16] These hardship awards ranged from 1.4% to
38.1% of total income; the median percentage surcharge

[16] Of this sum, however, one $599,757 award was not of immediate
benefit to the landlord. The Board granted the award only after its
original denial of relief was reversed by the Law Division. Pend-
ing resolution of the appeal, the Board ordered the entire award
placed in escrow.

The 1977 hardship applications reflected the tax passthrough re-
pealer of Ord. No. 76–8. Only one of the 8 awards would have been
denied if the tax pass-through had remained in effect all year. This
borderline case was a $121,357 award granted to Horizon House
(1260 units) which had an uncollected tax passthrough of $219,631.

was 13.65% (more than five times the annual automatic increase). In addition, the Department of Housing and Urban Development ("HUD") preempted local rent control for one 292-unit building.[17] Although three applications filed contemporaneously with requests for HUD preemption were processed by the Board within a month, the other applications were decided in two to five months. Decisions normally followed two or three public hearings.

In addition to the delay incidental to handling applications, the availability of financial data led to a further regulatory lag. For example, Bimar Fort Lee applied for hardship relief in August, 1976, and submitted financial information through December 31, 1975. After six hearings in November and December, 1976 and January, 1977, the Board issued its decision in February, 1977. Based on the 1975 data, Bimar received a $12,400 (9.76%) hardship award, payable in five monthly installments. No attempt was made to estimate the effect of known cost increases in 1976 (such as the tax passthrough repealer). In November, 1977 Bimar reapplied for hardship relief. After one hearing, the Board granted the landlord hardship relief of $25,582 (19.3%) in February, 1978 payable in 12 monthly installments. This decision was based on Bimar's financial position as of December 31, 1976.

For the reasons stated immediately below, we conclude that the Fort Lee ordinances did not provide constitutionally adequate administrative relief from the confiscatory effects of the 2.5% limitation. First, the time required to process hardship applications is substantial. The Rent Leveling Board

---

[17]Under 24 *CFR* § 403, HUD may preempt the application of local rent controls to a building with a federally insured mortgage if the local rent regulation "jeopardizes the Department's interest in the project." See generally Note, "Pre-emption of Local Rent Control Laws by HUD Regulation," 45 *Fordham L. Rev.* 651 (1976); Note, "HUD Pre-emption of Local Rent Control Ordinances — Tenants Entitled to Due Process Rights," 30 *Rutgers L. Rev.* 1025 (1977).

has improved significantly upon the four-to-nine month delay observed in 1975. In 1977, however, only applications which were subject to HUD preemption were processed in less than two months. Preferential treatment is accorded HUD-insured mortgagors as a result of an agreement between the Rent Leveling Board and HUD. (In 1975–76, HUD preempted local rent control over three buildings containing 2059 units.) The Rent Leveling Board's cooperative attitude toward the federal agency is, of course, laudable. It is not clear, however, why the Rent Leveling Board is unable to process *all* applications with equal dispatch. Hardship applications which were not subject to HUD preemption were disposed of in two to four months. In the event that some applications are to be expedited, it seems inequitable to delay applicants who have no other avenue of relief. The Rent Leveling Board promises further improvement in processing time, but Mr. Ellman, chairman of the Board, testified that the Board was already overburdened with its present hardship caseload. In light of the foreseeable increase in the number of hardship applications with declining NOI, future improvement is to be desired but can hardly be expected.

Second, regulatory lag has rendered inadequate the hardship awards actually granted. As noted above, Bimar Fort Lee received such awards in February 1977 and 1978, based upon data for 1975 and 1976, respectively. The 1976 relief was to be paid in 12 monthly installments, so theoretically the landlord would not have received his constitutionally minimum return for 1976 until February, 1979. In practice, of course, the landlord and Rent Leveling Board simply treat the award as income when received. From that perspective, however, hardship relief is equally ineffective. The Rent Leveling Board calculates what it considers to be the minimum constitutional return for the last fiscal year. The Board then grants relief exactly equal to the difference between the minimum constitutional and the actual return for that year. Because hardship awards do not become

adjustments to base rent, and because landlords' cost increases can be expected to exceed the 2.5% automatic rent increase each year, the magnitude of a building's hardship awards can also be expected to increase every year. Thus, the award which would have boosted Bimar's 1976 rate of return to the constitutional minimum will be inadequate to render constitutional the rate of return in 1978, when the award was actually received. Thus, even if a landlord qualifies for hardship relief, the current rate of return will remain below the constitutional minimum indefinitely.

Obviously, some regulatory lag is to be expected; indeed, the landlords' delay in assembling financial data contributes to the problem in the present case. This does not, however, justify the Rent Leveling Board in ignoring the consequences of administrative delay. After July, 1976, for example, the financial impact of the tax passthrough repealer was a matter of public record. Yet the Rent Leveling Board made no attempt to consider the current effect of the repealer in assessing hardship applications.[18] This problem has long been recognized in connection with setting rates for public utilities. Our decisions in that context describe such regulation as "a predictive science," *State v. N. J. Bell Tel. Co.*, 30 *N. J.* 16, 31 (1959), and emphasize that rates must provide a constitutional return in the year in which they are in effect. *Id.; In re Board's Investigation of Telephone Cos.*, 66 *N. J.* 476 (1975); *In re Intrastate Industrial Sand Rates*, 66 *N. J.* 12 (1974).

Third, the Rent Leveling Board's lack of power to revise base rents exacerbated the first two problems. Because the base rent remained disproportionately low despite any hardship award, the annual gap between income and expenses

---

[18] Most of the 1977 applications relied upon 1976 data, which included as income the pre-repeal fraction of the tax passthrough. In 1977, however, there would be no tax passthrough income. Nevertheless, hardship awards granted in 1977 were based on the 1976 data alone.

would inevitably grow, increasing reliance upon the hardship mechanism.

Fourth, the publicly-stated criteria for hardship relief were so vague that landlords could not know with reasonable certainty whether they would qualify. Justice Pashman warned of this pitfall in *Troy Hills Village, supra,* 68 *N. J.* at 621: "To say nothing more, for example, than that a landlord may seek relief if he cannot realize a reasonable profit from his investment would be inadequate * * *." Fort Lee Ord. No. 75-45 authorizes hardship relief if "a landlord cannot meet his mortgage payments, taxes, and current operating expenses on the dwelling, or cannot otherwise earn a fair and reasonable return upon his investment * * *." The "fair and reasonable return" condition in Ord. No. 75-45 is essentially identical to the example disapproved in *Troy Hills Village, supra.* The remaining condition is, if anything, worse. Since it makes no provision for a reasonable profit, it describes less than the minimum constitutional return. It appears to the legally unsophisticated reader, however, to state criteria for relief. Therefore, it may discourage meritorious hardship applications. Further discouragement is found in the cost of the Fort Lee hardship procedure. Several landlords stated, without contradiction, that the cost of an individual hardship application for a large highrise building exceeded $10,000. In addition, the Rent Leveling Board has assessed application fees of up to $1,500 to pay for its accountant's fees. It is not surprising, therefore, that the magnitude of the hardship awards, several times the annual automatic rent increase, suggests that landlords did not apply for hardship relief in the first year their rate of return fell below the constitutional minimum as defined by the Rent Leveling Board.

Finally, we have serious reservations about the constitutionality of the Rent Leveling Board's method of computing just and reasonable return. The Board purports to allow a specified rate of return upon the landlord's net cash investment after payment of reasonable operating expenses and debt

service. The testimony concerning calculation of investment by the Board was confused, and we will not attempt to comment on it. In contrast, the record shows clearly that the permitted rate of return was equal to one percent plus the mortgage constant on the applicant's first mortgage.[19] Reliance upon the terms of the applicant's mortgage, rather than current financing terms, leads to inequitable results. For example, the Board ruled on two hardship applications in January, 1978, applying rates of return of 7.4% and 10.05%, based upon the applicants' mortgage constants. Had both been allowed a 10% return, the first applicant would have received an additional $16,200. Even the borough's expert witness condemned this practice. We do not suggest that the permitted rate of return for all buildings must be equal. For example, rates of return might be adjusted to reflect different investment risks. Other jurisdictions have approved rate of return adjustments to encourage good building maintenance. See *Marshal House, Inc. v. Rent Control Board of Brookline, supra,* 358 *Mass.* 686, 266 *N. E.* 2d 876, 887 (1971). Similarly circumstanced landlords, however, must be treated alike. Discrimination based upon the age of mortgages serves no legitimate governmental purpose.[20]

 We need not decide whether any single weakness of the Fort Lee hardship mechanism is dispositive. We are satisfied that the entire hardship structure, as administered

---

[19]The mortgage constant is the percentage of the amount of the original mortgage debt which is equal to the annual payment for interest and amortization. For a conventional mortgage, repaid in equal periodic payments over the life of the mortgage, the mortgage constant will be slightly higher than the interest rate.

[20]In fact, the Rent Leveling Board formula undercuts the legislative purpose of the rent control ordinances. By tying permitted return to the terms of the applicant's financing, the Rent Leveling Board encourages landlords to refinance their mortgages at higher interest rates. This leads to higher rents for tenants directly, to cover increased debt service, and indirectly, because the Rent Leveling Board will now allow the landlord a larger return.

by the Fort Lee Rent Leveling Board, could not afford landlords prompt and efficacious relief from widespread confiscatory effects of the 2.5% limitation. Plaintiffs have shown that such effects were foreseeable after December, 1976. Therefore, we hold the 2.5% limitation to be invalid as applied after December 31, 1976.

The unconstitutionality of the 2.5% limitation does not invalidate all of Ord. No. 74–32. We are satisfied that the 2.5% limitation is severable, leaving in effect the prohibition on rent increases in excess of the percentage rise in the CPI. *Cf. Inganamort v. Borough of Fort Lee, supra,* 72 *N. J.* 412, 421–24 (1977).

Our holding is based on the combined effects of the limitation on automatic rent increases and the hardship relief mechanism. Neither the 2.5% limitation nor the hardship mechanism was inherently unconstitutional. The inadequacy of the automatic rent increases, coupled with the Rent Leveling Board's inability to change base rents, altered the Rent Leveling Board's function. Instead of serving as a rarely used safety valve to relieve unusual financial pressures, the Rent Leveling Board was administering rents in an increasing fraction of Fort Lee's 10,000 rental units. This is hardly a job for a part-time board without professional staff.

One commentator summarized the case against rent control structures like Fort Lee's as follows:

> The failure of New Jersey cities to budget funds for the purpose of providing rent leveling boards with technical staffs has put local controls in a particularly bad light. Presently the local boards do not have sufficient expertise to understand the complexities of rent regulation and real estate finance. The draftsmanship of local legislation has left something to be desired. Ordinances are copied from the neighboring municipality or the Fort Lee ordinance without much input from those who are trying to administer the "model" ordinance. The ineptitude and uncertainty surrounding local rent legislation has provided strong arguments for a state law. * * * * Tenants who spend thousands of dollars a year in rent might consider legislation providing that tenants pay a fee of $10 to $15 per year for the purpose of providing rent leveling boards with some professional staff. [Baar, "Rent Control in the 1970's: The Case of the New Jersey Tenants' Movement," 28 *Hastings L. J.* 631 (1977)]

Many of these criticisms are well taken. On the other hand, we recognize that many municipalities will continue to rely upon unpaid volunteer Rent Leveling Boards. They may do so if the automatic increases permitted by their ordinances do not produce widespread confiscatory effects. Judicial review provides an adequate remedy for isolated instances of insufficient administrative relief. The courts, however, provide no substitute for a smoothly functioning rent control ordinance.

IV

Section 4 of Ordinance No. 76–8 repealed the real estate tax passthrough provisions of Ordinance No. 74–32, effective June 30, 1976. Plaintiffs in A–166–77, *New Jersey Realty Co. v. Fort Lee,* and A–164–77, *Americana Assoc. v. Fort Lee,* challenged Section 4 ("tax passthrough repealer") as denying them a just and reasonable return.

In 1976, under the then existing ordinance, Fort Lee tenants faced the prospect of absorbing a 30% property tax increase. The tax passthrough repealer shifted this burden onto the landlords.[21] From the landlords' perspective, the 1976 real estate tax increase was equivalent to roughly 4.5% of their rental income. Thus, the automatic 2.5% rent increase was palpably inadequate to cover the increment in real estate taxes, even if other operating costs remained

---

[21]The tax passthrough repealer was in some sense an interim measure. Thirty days after final disposition of the present appeal, a new rent control plan based on a flexible cost-related formula ("MAP") was to take effect. This formula contained a modified tax passthrough provision. Thus, Ordinance No. 76–8 did not contemplate indefinite suspension of a tax passthrough provision. Unfortunately, the ordinance made no provision for reviewing the effect of the repealer on landlords during the pendency of the appeal, which has already lasted two years. Further, there is no guarantee that the MAP ordinance will not be repealed or superseded before it takes effect. Therefore, we must consider the potential long-term effects of the tax passthrough repealer.

constant. Among the older Fort Lee apartment buildings, net operating income in 1975 was comparable to that of 1973.[22] Without the uncollected portion of the 1976 tax passthrough, net operating income dropped in 1976 by more than 5% in 24 buildings, remained within 5% of the 1975 level in 8 buildings, and increased more than 5% in only 2. Net operating income fell by 10% or more in 16 of 34 buildings. Without the tax passthrough, future NOI would, of course, decline. See Section III *ante.*

■ We have already held that the 2.5% limitation *with* the tax passthrough was unconstitutional as applied after December 31, 1976. For the same reasons, the 2.5% limitation *without* the tax passthrough was immediately unconstitutional. Therefore, the tax passthrough repealer was void.

V

In the original trial in *New Jersey Realty Co. v. Fort Lee,* the court invalidated those portions of Ord. No. 76–8 which were to take effect "thirty (30) days following final and complete disposition of the appeal of the plaintiffs-appellants in the case of Harry B. Helmsley, et als. v. The Borough of Fort Lee, et als. * * *." The portions so condemned included the MAP formula for computing automatic rent increases. The borough cross-appealed from this ruling. A-167, *New Jersey Realty Co. v. Fort Lee*; A–165, *Americana Associates v. Fort Lee.*

■ On remand, the trial court summarized its rationale for invalidating these provisions: "The ruling was based upon a finding that the legislative intent was solely to repeal the tax surcharge provision and the rest of the language was merely camouflage." This finding cannot be reconciled with the plain meaning of the ordinance, which clearly embodied a revised rent control mechanism with a contingent effective

[22]Net operating income in 1975 was within 5% of the 1973 figure in 9 buildings, was lower in 6 buildings, and was higher in 8.

date. The motives of the borough council in passing the ordinance are irrelevant to the validity of the measure, absent a showing of fraud, personal interest, or corruption. *LaRue v. East Brunswick Tp.*, 68 *N. J. Super.* 435 (App. Div. 1961); *Kirzenbaum v. Paulus*, 57 *N. J. Super.* 80 (App. Div. 1959).

The contingent effective date, while unusual, is not unprecedented. Legislation, the effectiveness of which is conditioned upon the happening of a contingency, has generally been upheld. See, *e. g., City of Miami Beach v. Lansburgh*, 218 *So.* 2d 519 (Fla. Dist. Ct. App. 1969), reh. denied 226 *So.* 2d 821 (Fla. Sup. Ct. 1969) (municipal ordinance to take effect upon passage of bill pending in state legislature); *State v. Dumler*, 221 *Kan.* 386, 559 *P.* 2d 798 (1977) (state statute to expire when federal restrictions on speed limits removed); *Bracey Advertising Co. v. North Carolina Dept. of Transportation*, 35 *N. C. App.* 226, 241 *S. E.* 2d 146 (Ct. App. 1978) (state statute to take effect when state receives federal funds for implementation); *City of San Antonio v. Brady*, 159 *Tex.* 42, 315 *S. W.* 2d 597 (1958) (state statute applied to city when population exceeded 10,000); 2 *Sutherland, Statutory Construction* § 33.07 (4th ed. 1973). Our Court of Errors and Appeals upheld a statute whose effectiveness was contingent upon a referendum in *Hudspeth v. Swayze*, 85 *N. J. L.* 592 (1914). The Court termed contingent effective dates unobjectionable, and approved broad legislative discretion in enacting such measures:

[I]t makes no essential difference what is the nature of the contingency, so it be an equal and fair one, a moral and legal one, not opposed to sound policy, and so far connected with the object and purpose of the statute as not to be a mere idle and arbitrary one. [85 *N. J. L.* at 599]

The statute which recently established a tax court, *N. J. S. A.* 2A:3A–1 *et seq.*, states specifically that it "shall take effect July 1 next following adoption of the constitutional amendment presently pending as Assembly Concurrent Resolution No. 38 . . . ." *N. J. S. A.* 2A:3A–1 note.

 Fort Lee defends the delay in implementing the revised rent control scheme on grounds of practicality. It notes that an escrow fund had been established in connection with the *Helmsley* appeal. Landlords were permitted to collect rent increases equal to the percentage increase in the CPI if they placed increases above 2.5% in escrow. The borough argues that changing the formula for automatic increases while the *Helmsley* litigation was pending would have "create[d] mass chaos" and complicated administration of the escrow fund. We cannot say that postponing implementation of a new rent control structure until pending challenges to the old rent control system were resolved constituted an idle or arbitrary condition. The contingent effective date did not render any portion of Ord. No. 76–8 invalid.

 Since we have determined that Section 4 of Ord. No. 76–8, the tax passthrough repealer, was invalid, we must determine whether the remaining sections were severable. Ordinance No. 76–8 contained a severability clause; thus, there is a rebuttable presumption of severability. Section 4 and the remaining portions of the ordinance were clearly independent, self-contained legislative schemes. Notwithstanding the trial judge's characterization of the MAP plan as "camouflage" for the tax passthrough repealer, the evidence that the repealer was a significant inducement for adoption of the MAP plan is insufficient to overcome the presumption of severability. *Cf. Inganamort v. Borough of Fort Lee, supra,* 72 *N. J.* at 421–24. Therefore, the tax passthrough repealer is severable.

Since this opinion "final[ly] and complete[ly] dispos[es]" of the *Helmsley* appeal, all sections of Ord. No. 76–8 except section 4 will become effective in 30 days. Although the litigants have not addressed the substantive provisions of Ord. No. 76–8, we offer a few brief observations on the MAP formula, which will replace the 2.5% limitation. The maximum annual percentage ("MAP") increase is composed of weighted adjustments for increases in operating costs,

real estate taxes, and utility bills. The operating cost and utility adjustments are based on the "housing" and "gas and electricity" components of the CPI, respectively. The tax adjustment is based on the amount of taxes actually paid on an individual building. There is a fixed ceiling on annual increases of 6.5% for buildings in which the landlord pays for all utilities, and 5% in other buildings. A landlord may carry over to the next year increases in excess of the ceiling, but the carryover is subject to the next year's ceiling.

The MAP scheme, unlike the 2.5% limitation, attempts to relate rent increases to landlords' increased costs. Obviously, the effectiveness of the MAP formula depends upon how closely its adjustments approximate actual costs. Nevertheless, the MAP scheme appears to be a more balanced compromise of tenants' and landlords' interests. Tenants are protected from unjustified rent increases, but landlords are permitted to pass through reasonable increases in expenses. Similar cost-related increase formulas were applauded by most of the expert witnesses. The Public Advocate also recommended cost-related formulas as the fairest and easiest to administer a rent control system.

The fixed ceiling in the MAP ordinance deviates from a pure cost-related approach. Nevertheless, it differs in several respects from the 2.5% limitation. First, the 5.0–6.5% ceiling may not be so low that most landlords' NOI will decrease annually. Second, the carryover provision offers some means for landlords to recover from unusually large cost increases in a single year. Third, the formula recognizes some financial distinction between buildings in which the landlords and tenants, respectively, pay utility bills.

The MAP ordinance is far from perfect. If the rate of inflation accelerates, the fixed ceiling may prove to be too low. The carryover provision coupled with the ceiling may not suffice if unusual cost increases occur in successive years. Further, no attempt has been made to reduce long-term reliance on hardship relief once it is needed. There is no

provision for revising the base rents to which the MAP increase is applied. Nor is there any means of keeping the MAP current. The various adjustments for a calendar year are computed using data from the preceding October. Thus, the adjustments will be more than a year out of date for November and December leases. Since the adjustments are based on an index which is published monthly, it is not clear why a lag of this magnitude should be built into the ordinance. Notwithstanding these and other questions, the MAP plan appears to be an improvement over its predecessor.

The MAP ordinance also limits rent increases for tenants 62 or more years old to 80% of the formula rate. Ord. No. 76–8 § 3 ¶ 2.7. This provision is indistinguishable for constitutional purposes from the rent freeze for senior tenants we invalidated in *Property Owners Ass'n v. Tp. of North Bergen,* 74 *N. J.* 327 (1977). There, no automatic rent increases could be imposed on tenants 65 or more years old whose incomes were less than $5000. If a landlord qualified for hardship relief, he could increase senior tenants' rents up to 10%. We concluded that under the North Bergen ordinance the landlord or the other tenants were forced to subsidize the senior tenants unconstitutionally. Under the Fort Lee senior tenant provision, landlords are denied 20% of an otherwise permissible rent increase. As in North Bergen, either the landlord or the other tenants will have to supply the income lost from senior tenants.

Finally, we note that plaintiffs alleged that Ord. No. 76–8 was invalid because its passage was tainted by a conflict of interest. Members of the borough council who were tenants, according to plaintiffs, had a direct financial interest in the passage of the tax passthrough repealer which rendered improper their consideration of the ordinance. A disqualifying personal interest, however, is "one which is different from that which the public officer holds in common with members of the public." *Aldom v. Borough of Roseland,* 42 *N. J. Super.* 495, 507 (App. Div. 1956). The tenant-councilmen's interest in the tax passthrough repealer was no

different from a homeowner-councilman's interest in the property tax rate. Both are shared with large segments of the population, and are not likely to tempt a councilman to serve his own ends to the detriment of his constituents.

Similarly, plaintiffs' attempt to disqualify the tenant-councilmen by reason of bias must fail. In *Wollen v. Fort Lee,* 27 *N. J.* 408 (1958), we upheld the rezoning of a 44-acre tract for multiple-family dwellings against a similar challenge. Three of the victorious candidates in a recent councilmanic election had campaigned in favor of the rezoning. We found no improper bias in their official actions. Instead, we stated:

> But this is the democratic process; and it would be contrary to the basic principles of a free society to disqualify from service in the popular assembly those who had made pre-election commitments of policy on issues involved in the performance of their sworn legislative duties. Such is not the bias or prejudice upon which the law looks askance. There is no showing that the minds of these councilmen were not open to conviction in the just fulfillment of what they severally conceived to be a solemn obligation to the community. Otherwise, representative democracy would be subverted, and local self-government denied. [27 *N. J.* at 421]

## VI

On remand, the trial court found that vacancy decontrol[23] must be implemented in Fort Lee. This ruling effectively invalidated provisions in Ord. No. 74-32 and Ord. No. 76-8 which state that vacancies do not affect application of rent control to a unit. As the parties' briefs demonstrate, numerous arguments can be marshalled for and against vacancy decontrol. Resolution of this debate is clearly a legislative function. There is no basis on this

---

[23]Under vacancy decontrol, rent controls are removed once an apartment becomes vacant. Modified forms of vacancy decontrol permit a landlord to lease the unit for a higher rent, after which the unit is again subject to controls.

record for invalidating the municipality's explicit rejection of vacancy decontrol and the trial court ruling to the contrary must be reversed.

## VII

To summarize, we have held (1) the 2.5% limitation of Ord. No. 74–32 was unconstitutional as applied after December 31, 1976; (2) the tax passthrough repealer, section 4 of Ord. No. 76–8, was invalid; and (3) the remaining sections of Ord. No. 76–8 were not invalid and were severable from section 4. Those landlords who participated in the escrow arrangement will, of course, have recourse against moneys deposited after June 30, 1976, the effective date of the tax passthrough repealer. Since the conclusion of this appeal eliminates the need for the escrow fund, it should be distributed promptly. We make no order concerning the disposition of the fund, however, because some depositors in the escrow fund are not parties to this litigation.

Our analysis of the ordinances in this case may appear to be unorthodox. Usually, the validity of legislation and its administrative implementation are considered separately. As we said earlier, see section III *ante,* a continuing economic regulation like rent control has unusual confiscatory potential. If rent regulation is based upon assumptions about future economic trends which prove to be incorrect, landlords may sustain lower profits than intended. This situation will continue until the regulation is revised. Even if the landlord later receives full compensation, it will have lost the temporary use of the money. More important, even a temporary failure to correct for a sudden, severe economic change (*e.g.,* the rise in fuel prices during the Arab oil embargo) may lead to cash flow problems for landlords.[24] Finally, a workable standard for confiscation has proved to be elusive.

---

[24]One might argue that the landlord of an uncontrolled building would be equally vulnerable to crises, since his income is determined

Regulatory delay and the exact definition of confiscation have little practical impact so long as landlords are not dependant upon administrative relief. If, however, the automatic rent increases permitted under a rent control ordinance are disproportionately low, the theoretical rent structure embodied in the ordinance becomes irrelevant. Instead, landlords' income is now determined by the administrative implementation of the ordinance. A fair and efficient administrative relief mechanism can theoretically provide constitutional returns to landlords even under an ordinance with stringent limitations on automatic rent increases. Thus, in practice the effects of the automatic increase provisions in the ordinance and the hardship relief mechanism cannot be separated.

The foregoing analysis should make it clear that a municipality can constitutionally enact rent control ordinances with stringent controls like Fort Lee's. If it does so, however, it must be prepared to protect landlords' interests by providing prompt, fair, and efficacious administrative relief. Conversely, if a municipality is not prepared to support a sophisticated administrative relief system, it must adopt a more moderate rent control scheme, one which does not attempt to keep landlords' returns at the constitutional minimum. Obviously, such a scheme must at least be calculated to cover reasonable increases in landlords' operating costs without lengthy administrative proceedings.

We have refrained deliberately from formulating a numerical test for confiscation. The concept of a minimum constitutional return is a theoretical tool, not a measurable quantity which can be fixed with precision. Judicial review of rent control measures is limited to determining whether the return permitted by an ordinance falls above or below this theoretical dividing point. *Cf. Zussman v. Rent Control*

---

by long-term leases. Such a landlord, however, can reasonably be expected to have a greater profit cushion than the landlord of a rent controlled building.

*Bd. of Brookline,* 359 *N. E.* 2d 29, 32–33 (Mass. Sup. Jud. Ct. 1976).

Rent control implicates complex economic, social, and political issues. The state legislature is better equipped than most municipalities to formulate a comprehensive approach to this delicate problem. In conclusion, we endorse the New York Court of Appeals' discussion of legislative and judicial roles in rent regulation:

> This appeal has involved difficulties rarely confronting a court. The patchwork of rent-control legislation in recent years has created an impenetrable thicket confusing not only to laymen but to lawyers. Most important, under legitimate political pressures and the stress of economic and social tensions, the rational resolution of policy considerations vital to the well-being of the people in the City of New York have been handled on a day-to-day basis, and often by temporary makeshifts. As a consequence, the legislation contains serious gaps, not readily filled by interpretation based on intention, because there was none, or even by judicial construction to make reasonable and workable schemes that are self-abortive as designed. There is a limit to which courts may or should go in rectifying such statutory gaps. Because of the significant policies involved, they should be resolved by legislative action at the local or State level. At stake is the conservation of needed housing, the well-being of the residents of the city, and the according of respect to the property interests of building owners. * * * *
>
> Under the circumstances, the courts below and this court have endeavored to do what they can to correct a troubled situation. Ultimate resolution requires correction at the legislative level, State or local, and not at the judicial level. The courts have limited access to the controlling economic and social facts. They are also limited by a decent respect for the separation of powers upon which our system of government is based. [89 *Christopher Inc. v. Joy,* 35 *N. Y.* 2d 213, 360 *N. E.* 2d 612, 618, 318 *N. E.* 2d 776, 780–81 (1974)]

The judgment of the Law Division in *Helmsley v. Fort Lee* is modified as set forth above. The judgment of the Law Division in *New Jersey Realty Co. v. Fort Lee* and *Americana Assoc. v. Fort Lee* is reversed.

*For modification in Helmsley and reversal in New Jersey Realty Co. and Americana Assoc.*—Chief Justice HUGHES

244

and Justices MOUNTAIN, SULLIVAN, CLIFFORD, SCHREIBER and HANDLER—6.

*Opposed*—None.