170 N.J. Super. 167 (1979)
406 A.2d 177
DORIS MEAD T/A PARK TERRACE APARTMENTS, PLAINTIFF-RESPONDENT AND CROSS APPELLANT,
v.
BOROUGH OF FORT LEE, MAYOR AND COUNCIL OF THE BOROUGH OF FORT LEE, AND THE RENT LEVELING BOARD OF THE BOROUGH OF FORT LEE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 19, 1979.
Decided August 17, 1979.
*168 Before Judges ALLCORN, SEIDMAN and BOTTER.
Mr. Paul C. Kaufman argued the cause for appellants (Messrs. Kaufman & Rosen, attorneys).
Mr. Arnold D. Litt argued the cause for respondent-cross appellant (Messrs. Rusch & Litt, attorneys).
The opinion of the court was delivered by BOTTER, J.A.D.
The primary issue presented by this appeal is whether the Fort Lee Rent Leveling Board (Board) improperly disallowed *169 depreciation as an expense in calculating the rental income needed to give plaintiff a fair and reasonable return on her investment. In a prerogative writ action to review the Board's determination, the trial judge raised the "hardship increase" in rents granted by the Board from $3,364 to $12,000 a year, which was the sum requested in plaintiff's application, to take into account plaintiff's claim of $12,688 as a depreciation "expense." Defendants appealed from that portion of the judgment, and plaintiff cross-appealed, contending that in calculating fair return the Board erred in excluding as an operating expense the value of repair work allegedly performed by her husband.
On September 1, 1977 Robert C. Mead and Doris Mead filed an application with the Board for a hardship rent increase for 20 dwelling units owned by them[1] in a garden apartment complex on Myrtle Avenue, Fort Lee, consisting of three buildings. The application was filed pursuant to § 10 of Ordinance 74-32, as amended by § 2 of Ordinance 75-45 which provides "Criteria and Procedures" for obtaining tax surcharges and hardship increases.
The complex was constructed in 1961 and was purchased by Mr. and Mrs. Mead in 1968. The purchase price of $309,304 was paid by assuming mortgages and notes totaling $249,558, paying cash of $15,000 ($7,500 of which was for a real estate commission) and transferring other real property having an equity of $44,746. Thus, the landlord's initial investment in the property was $59,746. Amortization of the first mortgage, payment of a note and refinancing in 1973 by a new mortgage of $250,000 resulted in an "equity" of $71,422 as of December 31, 1976, the date used by the Board for its calculations. The Board treated the "equity" of $71,422 as the landlord's "total investment" in the property.
*170 The Board determined that a fair rate of return would be "one percentage point above the constant rate of payment on the first mortgage, or 10.27%." The reasonableness of this rate of return is not questioned on this appeal. (Mead testified that a 10% return after expenses would be a fair return.) Applying the 10.27% rate of return to the landlord's "total investment" of $71,422, the Board found that the landlord was entitled to a return on investment of $7,335 per year.
The total income in 1976 from all sources (apartment and garage rentals and laundry room revenues) was $54,245.[2] In calculating the fair return the Board allowed $27,088 in operating expenses.[3] It disallowed as expenses the figure given for depreciation and the value claimed for repair services performed by Mead. However, applying the standard established by the ordinance, the Board allowed as a "finance cost" mortgage interest and amortization, totaling $23,184, as well as the return on investment of $7,335. Thus, operating expenses and the "finance cost" came to $57,607. Since the total income of $54,245 was $3,362 less than that needed to cover the sum of operating expenses, mortgage amortization and interest, and the fair return, plaintiff was entitled to a rent increase in that amount. Due to a small mathematical error the increase allowed was $3,364.
*171 The Board's disallowance of the value of repairs made by Mead is the subject of the cross-appeal, which we will consider first. Mead testified that he made various repairs himself, such as replacing washers in faucets, replacing a switch on a sump pump, pumping out the basement and digging up a blocked drainage line. He estimated that he spent an average of eight to ten hours a week on repairs of this nature and that this work would have a minimum value of $7,000 a year if it were done by outside contractors. However, there was evidence to refute this claim. Although Mead said it would cost an average of $20 an hour to have the work done by contractors, he testified that he only made repairs that did not require "skilled professional help." Two tenants testified that they did their own repair work in their apartments, but it appears that repairs to air conditioners were made by a contractor. One of these tenants testified that he helped the building superintendent work on the boiler a few times. The superintendent rendered part-time service, cleaning halls and replacing light bulbs and the like, in exchange for an allowance in rent. Another tenant repaired the clothes washing machines, also in exchange for a rent allowance. There were no records submitted to substantiate the claim for Mead's labor.
The expenses allowed by the Board set forth in note 3 above include $1,988 for plumbing and electrical repairs performed by contractors in 1976, as well as an expense for "decorating, maintenance and supplies." (The tenants must paint their own apartments.) The Board also allowed a fee of 5% of the rental income from apartments and garages for management services performed by Mead although this was not actually paid to him by plaintiff. However, no allowance was made for Mead's repair work.
On appeal to the Law Division the trial judge affirmed the disallowance of this claim. He found that the Board's decision in this respect was not arbitrary and unreasonable. We, too, find that the Board could reasonably have concluded *172 that plaintiff did not satisfy her burden of proof as to this item of expense in that the evidence did not permit the Board to assess the value of Mead's occasional repair work with sufficient accuracy. Therefore, on plaintiff's cross-appeal, we affirm the decision below. See State v. Johnson, 42 N.J. 146, 162 (1964); Mayflower Securities Co., Inc. v. Bureau of Securities, 64 N.J. 85, 92-93 (1973).
We now reach the issue of depreciation. Plaintiff claimed as an expense $12,688 for depreciation of the buildings, parking lot, roof, heating unit, air conditioners, refrigerators and stoves. The depreciation was calculated on a straight-line basis using an initial total cost of $305,000, $45,000 of which was allocated to the cost of the land and $260,000 to depreciable items, namely, the buildings ($221,860) and the remaining components ($38,140). The buildings were assumed to have a total life of 33 years, with 25 years remaining after they were purchased by plaintiff. The other components were assigned a life of ten years each. No evidence was offered as to the age of the other components, but we know the apartments were first occupied in 1962. To emphasize the hypothetical nature of the depreciation figures that were proposed, we note that on plaintiff's income tax returns depreciation was based on a 25-year life for the building and all components, and an accelerated method was employed to yield a higher rate of depreciation in the early years and a declining rate over the balance of the assigned life of the property.
The Board gave no reasons in its written decision for rejecting depreciation as an expense. However, during the hearing the Board's chairman advised plaintiff's attorney that Fort Lee's ordinance "doesn't allow for payment for depreciation." His explanation was given in the following exchange:
MR. LITT: Well, I don't know anything in the ordinance that says that depreciation is not allowed. I understand that the Board's interpretation of the ordinance is such as not to allow depreciation.
THE CHAIRMAN: No. The ordinance is pretty distinct. It sets us up to go on a cash flow basis. In other words, we're supposed to maintain the mortgage *173 interest, see that the landlord maintains his mortgage interest, his amortization but not depreciation. Depreciation would be the profit factor.
There was no expert testimony offered on the method or methods used by real estate investors in calculating the return on investment sought in the marketplace. See Troy Hills v. Parsippany-Troy Hills Tp. Council, 68 N.J. 604, 621 (1975), where the court discussed factors to be considered in calculating a reasonable return under a rent control ordinance and said: "We expect that as cases are litigated and records of expert testimony are fully developed, more information will become available to refine and, if need be, alter these guidelines." This prediction was quickly realized in litigation challenging Fort Lee's rent leveling ordinance whose stormy history is reviewed in Helmsley v. Fort Lee, 78 N.J. 200, 204-209 (1978). A discussion of methods used to define "fair return" is found at 210-213.
Mead claimed some expertise as a real estate investor. He also owned a 43-unit apartment house in Passaic and two 20-unit buildings in Englewood. However, he offered no formula for determining a fair rate of return. Explaining why depreciation should be allowed as an expense he said: "Everything wears out. You should be allowed to save up a little money to replace refrigerators, to replace stoves, to replace the roof." He testified that he could not establish a reserve for replacing these components because the net income from this property was too low. In reply, appellant's counsel points out that the ordinance allows regular repair and maintenance costs as an expense, and § 11 provides for an increase in rent for capital improvements.[4]
*174 The case was heard in the Law Division on the record made before the Rent Leveling Board. (Fort Lee's governing body declined to review the Board's decision as was its custom. Helmsley v. Fort Lee, supra, 78 N.J., at 227.) The trial judge allowed the claim for depreciation. He found the amount reasonable  that the property's components were "properly life expected into 10 year component parts." He also approved the assignment of 33 years as the life of the building. As noted above, however, the building was approximately six or seven years old when purchased by plaintiff in 1968. If it had a 33-year life as of 1968 for depreciation purposes, its total "life expectancy" would have been 39 or 40 years. However, despite the assigned life expectancies, depreciation for rent control purposes was calculated on a 25 year life span. Furthermore, as noted above, there is no evidence in the record from which to conclude that the property's components, such as the roof and parking lot, had a life expectancy of ten years, and the trial judge had no basis for accepting these figures. The trial judge also concluded that Fort Lee's ordinance does not preclude use of a formula which includes depreciation as an expense item. Lastly, he read the Troy Hills case, supra, as a "mandate" to municipalities to treat depreciation "as an expensable item."
We disagree with the trial judge's analysis of this case and his interpretation of the Troy Hills case, and we reverse.
In Troy Hills v. Parsippany-Troy Hills Tp. Council, supra, Justice Pashman reviewed various factors that "should be considered" in determining a "just and reasonable return." 68 N.J. at 622. He stated that, "The landlord is entitled to reasonable expenses including taxes and depreciation." Id. at 626. There is no doubt that Justice Pashman was speaking of "depreciation for capital improvements * * * and depreciation on property." Id. However, he was discussing how to find the "current market value" of property, id. at 624-626, and the context in *175 which he discussed depreciation as an expense, at 626, is not clear. The discussion of methods for determining a fair return begins at 628, and the earlier discussion of expenses does not appear to be directly related to that subject. In any case, in discussing expenses that are to be taken into account, Justice Pashman went on to say that where an ordinance permits "direct surcharges" on tenants for realty tax increases or increased services, the surcharges should be excluded from gross income and operating expenses as well. Id. at 626-627. This principle may apply to the case at hand.
Section 11 of the Fort Lee ordinance allows a "rental surcharge" for capital improvements and "major additional services." It provides that such surcharge "shall not be considered rent," not even for the purpose of calculating the rent increase for which a landlord may apply under § 2 of the ordinance.[5] Thus, consistent with Troy Hills, surcharges for capital improvements could be allowed under the Fort Lee ordinance while disallowing depreciation for such items, since the landlord will recapture the cost through surcharges apart from his right to a fair return. This solution could apply to the landlord's claim for depreciation on the roof, parking lot and heating unit. We are not certain whether the Board would treat replacement of refrigerators and stoves as capital improvements. Nor do we know whether proper maintenance would preserve the buildings indefinitely for all practical purposes. There was no proof correlating the actual expected life of the buildings to the life cycle chosen for depreciation purposes. In any case, we prefer to base our decision on other, broader grounds. First, however, we will review some of the principles established by Troy Hills, its companion cases, Hutton Park Gardens v. West Orange Council, 68 N.J. 543 (1975), and Brunetti v. New Milford, 68 N.J. 576 (1975), and the more recent Helmsley v. Fort Lee, supra.
*176 In the Troy Hills, Hutton Park Gardens and Brunetti cases, the Supreme Court was dealing with the facial validity of certain rent control ordinances. The court did not mandate any formula for determining a fair return. The issue was not posed in specific terms because in none of these cases did the landlord seek to prove that his return on investment was inadequate. Troy Hills v. Parsippany-Troy Hills Tp. Council, supra, 68 N.J. at 620. Justice Pashman emphatically cautioned against the idea that any particular formula or method "is mandated by this opinion." Id. at 621. The stated purpose was to offer some "general" guidelines for evaluating a landlord's claim of confiscatory regulation, subject to refinement and alteration based on the record in subsequent cases. Id. Clearly, then, Justice Pashman's statement about treating depreciation as an expense was not a holding in the case and need not be applied in this case. In discussing a fair return necessary to pass constitutional muster, the opinions in Troy Hills, Hutton Park Gardens and Brunetti specifically state that various formulations may be acceptable, Troy Hills, 68 N.J. at 628; Brunetti, supra 68 N.J. at 596, that a return found sufficient in the marketplace may serve as a guide, see Troy Hills, 68 N.J. at 629, but that:
The rate of return permitted need not be as high as prevailed in the industry prior to regulation nor as much as an investor might obtain by placing his capital elsewhere. [Hutton Park Gardens v. West Orange Council, supra, 68 N.J. at 570]
We state these principles without implying that a constitutional question has been raised on this appeal or that the return allowed in this case would be unacceptable in a free, unregulated real estate market.
A fuller record containing expert testimony enabled Justice Mountain to elaborate further in Helmsley v. Fort Lee, supra, on the concept of a fair return. He stated that there are "at least three basic approaches to defining fair return," id. 78 N.J. at 210, one of which is return on investment as distinguished *177 from fair (market) value. Id. at 211. Another approach compares operating profits with gross income. Ibid.
Experts in the case testified to "a rate of return on value, defined as the ratio between net operating income ("NOI") and value, of 10.5% to 12%." Id. at 211-212. Net operating income was defined as "total income less operating expenses (e.g., maintenance costs, administrative expenses, fuel, real estate taxes)." Id. at 212, n. 5. In this connection Justice Mountain states:
Depreciation, a noncash item, is not considered an operating expense. Debt service is not classified as an operating expense, and will be paid out of net operating income. NOI less debt service is the landlord's cash flow before income taxes. [Ibid.]
Justice Mountain mentions cash flow in several passages, at 212, n. 5, at 219, n. 12, and at 221, and also states, at 214, 394 A.2d at 72, "The source of an apartment building's value is its income stream * * *." We think it pertinent, therefore, to relate formulae using the cash flow concept to the Fort Lee ordinance.
Section 10 of Ordinance 74-32, as amended by Ordinance 75-45, adopted August 20, 1975, authorizes a "hardship increase" when a "landlord cannot meet his mortgage payments, taxes, and current operating expenses on the dwelling, or cannot otherwise earn a fair and reasonable return upon his investment * * *." In considering whether a landlord is entitled to a hardship increase to assure a fair return, the ordinance directs the Board to consider the following factors:
(a) taxes;
(b) costs of maintenance and operation of property;
(c) the kind, quality and quantity of the services being furnished or withheld by the landlord;
(d) the number and frequency of prior hardship or capital improvement increases for the dwelling;

*178 (e) the landlord's original and current investment;
(f) the dates, amounts, terms and interest rates of all past and current mortgages on the dwelling;
(g) the amount of current professional and management fees and the relation, if any, between the landlord and the recipients of such fees;
(h) the age of the dwelling; as well as its original and current appraised value;
(i) the present and past rates of vacancy in the dwelling;
(j) the efficiency of current management;
(k) cash flow history, prior to the enactment of rent leveling, to present;
(l) other factors which the Board, through its experience, shall determine to affect the rate of return.
While the ordinance does not expressly exclude depreciation as an operating expense, as the trial judge noted, the criteria employed bear the stamp of a cash flow approach. The ordinance includes mortgage amortization as a criterion, although it is not considered an expense for income tax purposes. The ordinance enumerates certain costs to be considered, such as taxes, maintenance and operation of the property, and management fees, but depreciation is not mentioned. On the other hand, the ordinance specifically mentions "cash flow history," before and after rent control. Section 10(k). In fact, § 10's formulation implies a guaranty of the landlord's right to rental income sufficient, at least, to meet mortgage payments as well as taxes and current operating expenses.
Established principles of investment analysis determine return on real estate investments on a "cash flow" basis in which depreciation, a non-cash expense for income tax purposes,[6] is "added back" to measure the cash flow to the investor. Clettenberg and Kroncke, "How to Calculate Real Estate Return on Investment," 2 Real Estate Rev., No. 4, 105 (1973) (hereafter, Clettenberg and Kroncke); Maisel, Financing Real Estate  Principles and Practices, chapter 4 at 342 (1965) (hereafter, *179 Maisel); Wendt and Cerf, Real Estate Investment Analysis and Taxation, chapter 3 at 78-79 (1969) (hereafter Wendt and Cerf). Moreover, the value of depreciation in creating a tax shelter, namely, the taxes on other income which are avoided when depreciation creates a paper loss for income tax purposes, increases the investor's cash flow. Clettenberg and Kroncke, supra at 106. See also Maisel, supra at 365: "The depreciation for tax purposes less the amortization payment determines how much cash the owner receives on which he need not pay current income taxes  his so-called tax-free cash flow."
Professors Clettenberg and Kroncke explain the real estate investor's approach to return on investment as follows:
*180 In the examples given, cash flow is determined by excluding depreciation, deducting mortgage amortization and taxes, if any, and adding tax shelter benefits, if any. 2 Real Estate Rev. at 106. Clettenberg and Kroncke state that most authorities recommend the net present value (NPV) approach, which is explained in their article, and they concur in that recommendation. Id. at 109. The significant point for our purposes is that this approach utilizes cash flow to determine the desired rate of return, and the depreciation expense taken for tax purposes is added back in calculating cash flow while mortgage debt payments are deducted from gross income. See also Maisel, supra at 364; Wendt and Cerf, supra at 79-80.
Another important aspect of the cash flow approach is the advantage to an investor when the amortization rate is greater than the true or actual depreciation of the property. In addition to receiving cash from his operations, the investor will pay off part of the principal of the mortgage, increasing his equity in the property to the extent that the payment against principal exceeds the actual decline in the market value of his property. Wendt and Cerf, supra at 79-80. Of course, if the property increases in market value, so much the better for the investor. Professor Maisel states this relationship as follows: "The amortization rate less true depreciation determines how fast the owner builds up his equity in the property." Maisel, supra at 365. Thus, measuring cash flow will show the true return to an investor. The actual depreciation or appreciation of the property determines the success of the venture, not the theoretical depreciation figure used for income tax purposes, or, as here, in applying for a rent increase.
In the case at hand Mead testified that the true market value of the property had increased to over $400,000. The property was valued at $300,000 in 1973 for mortgage refinancing purposes, and its 1976 assessment at $311,000, if adjusted to true value, would bring its market value to $425,000 according to *181 plaintiff's attorney. Thus, the evidence convincingly demonstrates that there has been no real depreciation in value since 1968. The contrary is more likely. We note, also, that the total depreciation of the buildings would still leave plaintiff in possession of land having a current value which is approximately equal to or greater than the original investment of $59,746. (The land has been assessed at $70,000 from 1971 to 1976.) Moreover, rental income has been sufficient to retire debt at a rate that will exceed $100,000 by 1988. If the market value remains constant, this will represent an additional return to plaintiff on her investment.
We conclude, therefore, that plaintiff has failed to demonstrate that the exclusion of depreciation as an expense in the formula used by the Board denies her a fair return. The Board's approach, which corresponds to the standards contained in the ordinance, is presumed to be correct, see Ring v. Rutherford Council, 110 N.J. Super. 441, 445 (App.Div.), certif. den. 57 N.J. 125 (1970), cert. den. 401 U.S. 911, 91 S.Ct. 876, 27 L.Ed.2d 810 (1971); cf. Motyka v. McCorkle, 58 N.J. 165, 181 (1971); Consolidation Coal Co. v. Kandle, 105 N.J. Super. 104, 113-114 (App.Div.), aff'd on opinion below, 54 N.J. 11 (1969), and the record contains no evidence that it is arbitrary or unreasonable. To allow depreciation as an expense and at the same time guaranty a landlord sufficient revenues to pay off the mortgage principal as well as interest could result, in effect, in the landlord recovering almost two times the cost of the apartment complex, since her original investment was only a fraction of that cost. Thus, we are not persuaded that the judiciary should compel the Board to adopt plaintiff's formula for determining fair return.
The trial judge erred in reversing the Board's determination and in raising the rent increase beyond that granted by the Board. An allowance of $12,688 in depreciation expenses would have entitled the landlord to a total annual rent increase of $16,050 over the preexisting cash flow of $3973 as calculated by *182 the Board. This would produce a total annual cash flow of $20,023, which is 33.5% of the original investment in the property or 28% of the total investment figure, used by the Board, as of December 31, 1976. Although the total rent increase ordered by the trial judge was limited to the $12,000 sought by plaintiff in her application  a limitation which plaintiff's attorney insisted upon  the trial judge's theory would have justified the granting of an aggregate annual rent increase of $16,050. On the record before us, such an increase is entirely unjustified.
We vacate the judgment below and reinstate the Board's order, effective as of its original date. The trial judge's order was not stayed; however, we had ordered that the additional surcharge granted by the trial judge be held in escrow pending this appeal. Therefore, we remand the case to the Law Division for such proceedings as are necessary to ensure the proper distribution of the escrow funds.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] The application was in both names although title had been conveyed by Mr. Mead to his wife, the plaintiff, in 1975 for $1 of consideration. The property had been purchased by them in their joint names in 1968.
[2] The Board's written decision mistakenly states that the total rental income was $54,114, which was the 1975 figure, but the Board's calculations were based on the correct 1976 income figure.
[3] The breakdown is as follows:

 Real estate taxes $12,351
 Utilities  gas, electric and water 8,164
 Plumbing and electrical repairs 1,988
 Insurance 877
 Garbage removal 495
 Decorating, maintenance and supplies 428
 Professional fees 100
 Management fees 2,685
 _______
 TOTAL EXPENSES $27,088

[4] The definition given in § 1(a) is:

`Capital improvement' means capital which is expended by a landlord in the nature of an investment for the improvement of a dwelling made with the expectation of its useful existence for an indefinite period into the future, and which will insure [sic] in some significant degree to the benefit of the tenants thereof.
Section 11 limits any increase to 15% of a tenant's rent. Cf. Helmsley v. Fort Lee, supra.
[5] Helmsley v. Fort Lee, supra, 78 N.J. at 233, invalidated the 2.5% limitation on rent increases contained in § 2.
[6] 26 U.S.C.A. § 167.

Investment in real estate is a capital-budgeting decision. The cash inflow and outflow associated with a project is accounted for and appropriately discounted. A wide variety of capital-budgeting techniques are available and each can reach a different result. These techniques culminate in a measure of value, a rate of return, or an index such that a number of competing investment proposals can be ranked. In the context of a specific real estate investment decision, we will demonstrate in this article the payback method, net present value (NPV) analysis, and the internal rate of return (IRR).
* * * * * * * *
All three methods of capital budgeting have the same starting point, i.e., a determination of the annual cash flows of the project. For this, it is necessary to calculate the depreciation schedule and the amortization and interest schedule. * * *
* * * * * * * *
The cash flow, exclusive of the sale of the property after ten years, is calculated in Table 3. The procedure used to measure cash flow is to first determine taxable income and then to add back all noncash charges, in this case, depreciation.
If the project produced a negative taxable income in any year, then a tax shelter would exist and must be accounted for in the computation of that year's cash flow. For example, if in year one, the taxable income was minus $23,000 (i.e., a taxable loss of $23,000) instead of a positive $23,000; then a tax shelter of up to $11,500 would exist for our 50 percent investor. * * * [2 Real Estate Rev. at 105-106]