BRANCH BROOK GARDENS TENANTS ASSOCIATION, AN UNIN-
CORPORATED ASSOCIATION, AND WANDA TUCKER, INDI-
VIDUALLY, PLAINTIFFS-APPELLANTS, v. RENT LEVELING
BOARD OF THE TOWN OF BELLEVILLE, BRANCH BROOK
GARDENS, A PARTNERSHIP, AND SAMUEL GELTMAN AS-
SOCIATES, INC., A CORPORATION OF THE STATE OF NEW
JERSEY, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued September 30, 1980—Decided October 16, 1980.

1

Before Judges MATTHEWS, MORGAN and MORTON I. GREENBERG.

*Ronald Schwartz* argued the cause for plaintiffs-appellants (*Salkin, Schwartz & Jaskot,* attorneys).

*Frank Pomaco* argued the cause for defendant-respondent, Branch Brook Gardens, a partnership (*Gaccione, Pomaco, Patton & Beck,* attorneys).

*Frank Zinna* argued the cause for defendant-respondent, Rent Leveling Board of the Town of Belleville.

The opinion of the court was delivered by

MORTON I. GREENBERG, J. A. D.

Plaintiffs Branch Brook Gardens Tenants Association and Wanda Tucker, president of the association (hereinafter called "tenants"), brought this action against the Rent Leveling Board (hereinafter called "board") of the Town of Belleville and against Branch Brook Gardens (hereinafter called "landlord"), the owner of a 404-unit apartment complex in Belleville.[1] The members of the association as well as Tucker individually are tenants in the apartment complex. The action was generated by the landlord's application in October 1978 for an increase in rent in accordance with the rent leveling ordinance of the Town of Belleville. This application was considered by the board on February 8, 1979 and resulted in a motion being passed granting a rent increase. A further motion with respect to the matter was adopted by the board on March 1, 1979.

This action in lieu of prerogative writ was commenced March 30, 1979. Plaintiffs alleged that the proceedings of February 8,

---

[1]An additional defendant to this action is Samuel Geltman Associates, Inc., allegedly the manager of the apartment complex. But for purposes of this opinion the landlord may be treated as the only defendant other than the board. We also note that the record is not clear as to whether the landlord is a partnership or a corporation but the difference cannot affect the outcome of this litigation.

1979 were procedurally defective in that counsel for the tenants as well as any unrepresented tenants had no opportunity for cross examination, that the board accepted the landlord's figures without inquiry into their validity, that proper findings of fact were not made, that the rent leveling ordinance is self-contradictory, that the hardship provision of the ordinance is void, capricious and unworkable, that the anniversary dates of the tenants' leases were improperly changed and that appropriate notices of the March 1, 1980 meeting were not mailed to the tenants. The trial judge heard oral argument and decided the case by a letter opinion dated August 2, 1979. He reasoned that plaintiffs had 45 days from February 8, 1979 to challenge the action taken that day and that since the case had been commenced on March 30, 1979 it was not timely.[2] R. 4:69–6(a). He further held that adoption of the motion of March 1, 1979 did not extend the time for bringing the action since it was simply an explanation of the earlier motion. He also decided that the ordinance was not unconstitutional as it provided a reasonable basis for determining rate increases. The trial judge thus granted summary judgment for defendants and entered the appropriate order September 10, 1979. Plaintiffs appeal from that order.

Disposition of this appeal requires consideration of the rent leveling ordinance and the procedures followed by the board in this case. The ordinance does not preclude a landlord from charging the rent in existence at its adoption. But it does provide that:

At the expiration of a lease or at the termination of the lease of a periodic tenant, or at the annual anniversary of a lease for a term of more than one (1) year (if the lease so provides), no landlord may request or receive a percentage increase in rent which is greater than 5% of the total monthly rents for the preceding calendar year except on formal application to the Rent Leveling Board with notice to all tenants affected.

[2]The opinion recites that the action was started April 3, 1979 but the correct date was March 30, 1979. The difference will not change the outcome of the litigation as both dates are beyond 45 days from February 8, 1979.

Periodic tenants will be included under this ordinance and shall be entitled to the same protection as tenants under lease except that a landlord seeking an increase with respect to periodic tenants shall give said tenant thirty (30) days notice with respect to any proposed increase in rent.

A periodic tenant is defined as a person who is a "month to month tenant or any tenant at will, or sufferance, or any tenant having a lease for less than one (1) year." A landlord is required to give notice to the tenant of any proposed rent increase allowed by the 5% clause and the calculations justifying it.

The ordinance has a provision for rent increases above those provided by the 5% provision. It reads as follows:

In the event that a landlord cannot realize a 10% return on his investment based on the annexed formula.[3] The Board may grant the landlord a hardship rent increase to meet these payments for good cause shown. Prior to any such appeal to the Rent Leveling Board a landlord must serve notice on all affected tenants at least ten (10) days prior to the hearing date and the landlord must post in the lobby of each building, or if no lobby is present, in a conspicuous place in and about the premises, a notice of said appeal, setting forth the basis for said appeal. Said notice must be posted for at least ten (10) days prior to the published date of the appeal. The affected tenants shall have the right to challenge the basis of the facts for the hardship increase on the hearing date thereof.

In computing rental increase or rental rebates as provided under this Ordinance, the amount so computed shall be rounded off to the nearest dollar.

A landlord shall be limited to one (1) request for a rental increase annually.

The formula states:

FORMULA USED BY THE RENT LEVELING BOARD IN DETERMINING RENT INCREASES.

The total assessed valuation of land and building figure is to be used to determine a 10% return on your investment.

Expenses to be taken into consideration are:

Heat

Insurance

Taxes

Water

Repairs

Miscellaneous

---

[3]The clause appears in this form in the ordinance.

Example:
Assessed Value Land & Building    –    $140,000.00
                    Return 10%    –        14,000.00
Total Income            –    $27,000.00
Less total expenses        –        15,000.00
Net Return            –        12,000.00
Would then allow        –    $14,160.00 or 10% return
Rents would be increased 8%.[4]

Since this provision is intended to guarantee the landlord an adequate return it is called a "hardship" provision.

It is evident that this ordinance never requires an increase in rents. Its thrust differs from rate regulation of insurance companies or public utilities in that the agencies regulating such entities may compel the regulated company to increase rates to guarantee maintenance of service. *N.J.S.A.* 17:29A–6; *N.J.S.A.* 48:2–21. But the Belleville ordinance gives the board no such authority. If a landlord is satisfied with rents less than the maximum allowable no one can insist that he accept more. What the ordinance does do is place a ceiling on what the landlord may charge.

Pursuant to the hardship provision of the ordinance the landlord sought a rate increase in October 1978 to obtain such rents as would yield a 10% return on its investment. Notice of a hearing on this application was given the tenants. The matter was scheduled originally for January 16, 1979 but was postponed until February 8, 1979, apparently so that the tenants could obtain counsel. We understand that a large number of tenants appeared at the meeting. An attorney representing at least some of the tenants also was there.[5] When the meeting started

---

[4]The example provides for $160 extra rent and this rounds off to an even 8%. The ordinance allows rounding off.

[5]Not counsel on this appeal.

the chairman of the board asked whether any tenants would be speaking other than through the attorney. None replied and thus the chairman concluded that the attorney was representing all the tenants. The landlord then distributed a revised sheet showing the figures which supported the application. These numbers reflected its actual 1978 income and expenses. Various witnesses testified in support of the landlord's position. The attorney for the tenants and the board members cross examined them. The chairman on two occasions stated that the tenants' attorney could present witnesses but no one testified for the tenants. Though the attorney did object to particular questions and figures presented, there was no suggestion that the overall procedure being followed was irregular or improper.

At the conclusion of the hearing counsel for the two sides were given time to sum up. The tenants' attorney stated that "we are not concerned with the figures they use." He simply argued that the landlord, on the basis of its figures, was receiving a return of over 7% on its investment and this represented a fair and reasonable return and was more than sufficient. He asserted that any increase over 5% would be inflationary.

It thus appears that the tenants did not seriously challenge the mathematical basis for the rent increases. They presented no evidence that could have justified the board in denying the application. Rather counsel for the tenants invited the board to deny the landlord relief by not following the ordinance. But instead the board followed the ordinance which allowed a 10% return on the investment based upon "the assessment or the assessed valuation of the property." The board calculated that the authorized return could be reached only if the landlord obtained a 13.5% rent increase. The 13.5% included the 5% allowed without resort to the hardship clause and thus the hardship clause was used to authorize an 8.5% increase. The record then shows that the following ensued:

Mr. Del Tufo: Then I am ready to make a motion that the application of Branch Brook Gardens be granted a 13.5% rent increase effective April 1st for all month

to month tenants.  Any tenant under lease the rent increase would not be effective until the termination of their lease.  Seconded by Mrs. Spray.  Chairman Cantarella:  Any discussion?  If not, will the clerk please call the roll.  The Vote: 4 to 1 (abstention by Mrs. DeFeo)
Chairman Cantarella:  You have the right to appeal the decision.

Unfortunately there was confusion as to the meaning of the decision.  Quite plainly the 13.5% increase was intended to include the 5% increase allowable without permission.  If it did not include the 5% then the landlord would have received a return in excess of that permitted by the ordinance since the 13.5% increase in itself would produce a 10% return on the investment.  This was recognized by the board at the February 8, 1979 meeting.  Nevertheless the board was told at the meeting on March 1, 1979 that the landlord had proposed increasing rents by 5% in addition to the 13.5%.  Thus tenants whose rents were subject to a 5% increase in 1979 before April 1, 1979 would still be increased an additional 13.5% on that date.  Such action would be plainly inconsistent with the February 8, 1979 motion since the rate increase was predicated on the 1978 results and did not take into account additional income generated by ordinary 5% rent increases in 1979.  Consequently tacking a 13.5% increase on to a 5% increase would result in a net increase in excess of that allowed by the ordinance and the board.  Certainly the February 8, 1979 motion did not authorize an 18.5% increase.  Therefore on March 1, 1979 the board, in order to clear up any misunderstanding, stated that with respect to tenants who had paid 5% increases in January, February and March that the increase on April 1 would be 8.5%.  With respect to other tenants the increase allowable would be 13.5% as of April 1, 1979.  This 13.5% increase as of April 1, 1979 was plainly intended to apply only to month to month tenants or other tenants whose leases expired by that time.  This is not disputable since the motion of February 8, 1979 said that: "Any tenant under lease the rent increase would not be effective until the termination of their lease."

■ We agree with the determination of the trial judge that plaintiffs' complaint seeking review of the motions of February 8, 1979 and March 1, 1979 was not filed within the time allowed by the rules of court. Unquestionably the case was started beyond the 45–day limitation specified by *R.* 4:69–6(a). The motion of March 1, 1979 added nothing to the prior determination of the board. Indeed we do not understand why there was any confusion. The board on February 8, 1979 made it perfectly clear that the 13.5% increase included the 5% allowable without permission. Thus it should have been evident that if the landlord increased the rent 5% in 1979 before April 1, only 8.5% could be added at that time. Further since the 13.5% increase was to be effective as of April 1, 1979 then certainly the rent allowable under the month to month tenancies could under the motion of February 8, 1979 be increased as of April 1, 1979 beyond 5%. The March 1, 1979 motion changed nothing and in our view was unnecessary. Thus the cause of action accrued as of February 8, 1979.

Plaintiffs argue that the trial judge had discretion to extend the time for contesting the increase and that he failed to exercise that discretion either to grant or deny an extension. They further assert that even if they were late in bringing the action the time should have been extended pursuant to *R.* 4:69–6(c) which permits enlargement where it is manifest that the interest of justice so requires.

■ It is true that the record supports the view that the trial judge thought that he could not enlarge the time for bringing the action. But nevertheless we find no error because an appropriate exercise of discretion would not have resulted in an extension of time for several reasons. The chairman of the board announced at the February 8, 1979 meeting that the tenants could appeal the decision. Further the tenants or at least some of them were represented by counsel. Thus the tenants were aware of their right to judicial recourse. The delay in bringing this action cannot be condoned because a

landlord hardship matter is intended to be dealt with expeditiously.  *Helmsley v. Fort Lee*, 78 *N.J.* 200, 226 (1978), app. dism. 440 *U.S.* 978, 99 *S.Ct.* 1782, 60 *L.Ed.*2d 237 (1979).  Here the tenants had been granted an extension to prepare for the hearing before the board and thus there already had been delay.

Most significantly plaintiffs' complaint did not raise substantial factual or legal questions.  While plaintiffs assert that there were procedural violations at the hearing of February 8, 1979 the fact is that the tenants simply did not avail themselves of their opportunity to oppose the financial data of the landlord. Indeed ultimately their attorney confined his argument to a challenge to the ordinance itself.  The procedural defects of which plaintiffs now complain were not raised at the hearing. There was an opportunity for cross examination.  The board did make findings of fact because it accepted the figures presented and carefully determined the allowable rent.  In reality what plaintiffs sought from the trial judge was another hearing on the merits in order to present the case they did not develop on February 8, 1979.  The suggestion that the anniversary date of any lease was changed is simply wrong.  The board allowed increases as of April 1, 1979 but this was to be effective only if nothing in any lease between the landlord and a tenant precluded the increase.  Finally there was no need for additional notice of the meeting of March 1, 1979 to be given as the action at that meeting changed nothing.  Our review of the matter convinces us that even if the case had been decided on the merits plaintiffs would have lost on a summary judgment.  The trial judge could have come to no other conclusion since he would have decided the matter on the record.  *See Mead v. Fort Lee*, 170 *N.J.Super.* 167, 174 (App.Div.1979), certif. den. 82 *N.J.* 263 (1979).  In these circumstances the time limitation of *R.* 4:69–6(a) should not have been enlarged.

▉ Plaintiffs' challenges to the ordinance are without merit.  They assert that the ordinance is contradictory and unworkable.  But if plaintiffs are correct as to this contention their

argument might lead the court to invalidate the ordinance since without a hardship provision it could prove confiscatory. *Helmsley v. Fort Lee, supra,* 78 *N.J.* at 226. But in fact the ordinance is not contradictory or unworkable. The hardship provision allows the landlord "a 10% return on his investment based on the annexed formula." It is apparent, of course, that the term "investment" standing alone is ambiguous. It might mean the original purchase price. It could signify that price exclusive of the financed portion. *See Overlook Terrace Management Corp. v. Rent Control Bd.,* 71 *N.J.* 451, 455 (1976). It could mean current marketttvalue. Possibly it could include improvements but with a discount for depreciation. Fortunately we need not speculate on what "investment" signifies since it is set forth in the ordinance. The formula tells us that: "The total assessed valuation of land and building figure is to be used to determine a 10% return on your investment." Thus purchase price and financing are not germane in the calculation. Plainly the assessed valuation is readily determinable and consequently the formula is quite workable. The fact that plaintiffs do not regard the assessed valuation as the landlord's investment is irrelevant. The municipal governing body may define "investment" as it desires so long as it establishes the term with reasonable certainty. *See Abrahams v. Civil Service Comm'n,* 65 *N.J.* 61, 73–73 (1974). Here the certainty was absolute.

The formula is not unworkable by reason of a "spiraling" effect which means that an increase in rent could create an increase in value justifying a further increase in rent and so on. *See Helmsley v. Fort Lee, supra,* 78 *N.J.* at 213–215; *Troy Hills Village v. Parsippany-Troy Hills,* 68 *N.J.* 604, 625 (1975). Here we are dealing with a large and presumably well managed apartment complex. Its assessment will be a product of the rent since the assessment ordinarily would be predicated on the capitalized income method of valuation. *Parkview Village Associates v. Collingswood,* 62 *N.J.* 21 (1972). The municipality has, by the hardship provision, established that the return should be 10% on assessed valuation. While we recognize that it could be

argued that a proper capitalization rate for tax assessment purposes may be different (*New Brunswick v. State of New Jersey*, 39 *N.J.* 537, 550–55 (1963)) nevertheless to obtain a higher rent and increased net return under the ordinance the landlord would be required to seek a higher assessment since we do not believe that in this era of rising prices the 5% increase could result in a higher net return and thus a higher assessment justifying an increase under the hardship provision. Experience shows that property owners do not seek higher assessments. While, of course, the landlord might seek a lower assessment by arguing for a higher justified percentage yield from which to capitalize this is not to be anticipated since success would mean it would be entitled to only a lower rent level. In the long run because of the relationship of rents to assessment the ordinance should promote stability in assessment. In the very least it will not prove unworkable for certainly a change in rents would not result in an immediate change in assessed value but rather should reflect adjustments to keep the net return to the landlord constant.[6]

Plaintiffs argue that if investment means a return on a fair value formula then the hardship provision is void since it does not have a real and substantial relation to the objective of leveling rents. This argument must be rejected for two reasons. Firstly it is not true. Quite to the contrary even assuming that a landlord would always seek maximum rentals, upward adjustments would simply compensate for increased costs unless the assessment was raised. And as already discussed there is no reason to think that assessments will be raised because of the rent adjustments. Thus plaintiffs have not overcome the presumption of reasonableness of the ordinance. *Hutton Park Gardens v. West Orange*, 68 *N.J.* 543, 564 (1975).

---

[6]We express no opinion as to the validity of the ordinance if challenged by other taxpayers. By tying rent increases to assessments the assessment of the property should be held down even if other properties in Belleville are increasing in value. It would appear that a Belleville-type ordinance creates a property which literally is a "tax shelter."

Secondly plaintiffs do not have standing to assert illegality of the provision. Such a challenge differs from an attack on the motion granting an increase. Plaintiffs did have standing to question that motion but were barred by *R.* 4:69–6(a). With respect to the challenge to the ordinance on the basis that it will not level rents it is imperative to note that plaintiffs are tenants and not landlords. No provision of our State or federal constitutions or statutory or common law requires that Belleville enact a rent leveling ordinance. We have no question but that rent control may be abolished entirely at the option of the municipal governing body. Indeed once adopted we doubt that a municipality may lawfully continue it absent an ongoing rational basis for its need. *See Hutton Park Gardens v. West Orange, supra,* 68 *N.J.* at 564 (1975). Since a municipality may decline to institute or continue rent control we must conclude that tenants do not have standing to challenge a hardship provision of an ordinance on the basis of an assertion that it allows though does not require an unreasonable rate of return. *See United States v. Salvucci,* 448 *U.S.* 83, 100 *S.Ct.* 2547, 65 *L.Ed.2d* 619 (1980); *State v. Parker,* 153 *N.J.Super.* 481, 488 (App.Div.1977). No matter how much of an increase is allowed it cannot exceed that permitted in an uncontrolled market. The ordinance may allow any rate of return provided it guarantees the landlord at least a constitutionally permissible rate. *Troy Hills Village v. Parsippany-Troy Hills, supra,* 68 *N.J.* at 629–630. Of course we would reach a different result if the ordinance compelled the landlord to accept a rate of return specified by it. Such an ordinance would not simply level rents, it would fix them. *Ibid.* But nothing in the Belleville ordinance suggests that a landlord and tenant may not negotiate for a lower rent than that allowable by the ordinance.

We are aware there has been much litigation dealing with rent increase and limitation provisions in leveling ordinances. *See, e. g., Helmsley v. Fort Lee, supra,* 78 *N.J.* 200; *Troy Hills Village v. Parsippany-Troy Hills, supra,* 68 *N.J.* 604; *Brunetti v. New Milford,* 68 *N.J.* 576 (1975); *Hutton Park Gardens v. West*

*Orange, supra,* 68 *N.J.* 543. But the decisions concerning the validity of the ordinances have been made in the context of determining whether the ordinances have permitted the landlords a constitutionally adequate return or are confiscatory. The courts have not held that tenants have a "right" to a limitation on their rents though perhaps once a leveling ordinance is adopted they do have a "right" to workable provisions. Thus it is not anomalous that a provision which in some circumstances is confiscatory and thus voidable in an action by a landlord cannot, when providing for allegedly unreasonably high rent increases, be successfully challenged by its tenants.

The judgment of September 10, 1979 of the Superior Court, Law Division, is affirmed.